[No. S024685. Dec. 24, 1992.]

SOUTHERN CALIFORNIA CHAPTER OF ASSOCIATED BUILDERS
AND CONTRACTORS, INC., JOINT APPRENTICESHIP COMMITTEE,
Plaintiff and Respondent, v.
CALIFORNIA APPRENTICESHIP COUNCIL, Defendant and Appellant;
DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF
APPRENTICESHIP STANDARDS, Defendant and Respondent;
RIVERSIDE AND SAN BERNARDINO ELECTRICAL JOINT
APPRENTICESHIP AND TRAINING COMMITTEES, Real Party in
Interest and Appellant.

424

426

COUNSEL

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Edmond B. Mamer, Jack T. Kerry and Jack Newman, Deputy Attorneys General, for Defendant and Appellant.

Stanton, Kay & Watson, Lawrence H. Kay, William L. Porter, Kirk M. Prindle, Altshuler, Berzon, Nussbaum, Berzon & Rubin, Peter D. Nussbaum, Daniel T. Purtell, Carr, McClellan, Ingersoll, Thompson & Horn, Paul V. Simpson, Schmeltzer, Aptaker & Shepard, Gary L. Lieber, Scott Robins, Henry A. Platt, Littler, Mendelson, Fastiff & Tichy, Arthur Mendelson, James P. Baker and Sue Means as Amici Curiae on behalf of Defendant and Appellant.

Hill, Farrer & Burrill and Ronald W. Novotny for Real Party in Interest and Appellant.

Thierman, Cook, Brown & Prager, Mark R. Thierman, John W. Prager, Jr., Margaret Wilson and George P. Parisotto for Plaintiff and Respondent.

John M. Rea, Vanessa L. Holton and David Allen Kizer for Defendant and Respondent.

OPINION

PANELLI, J.—This case arises out of a request by the Joint Apprenticeship Committee of the Southern California Chapter of Associated Builders and Contractors, Inc. (hereafter ABC-JAC), a nonunion group of contractors, for state approval of an apprenticeship program to be operated in certain areas of the state where programs affiliated with unions, the Riverside and San Bernardino Electrical Joint Apprenticeship and Training Committees and the Orange County Electrical Joint Apprenticeship and Training Committee (hereafter existing programs), are already operating. The existing programs objected to approval of the ABC-JAC program. The request for approval was ultimately denied by the state administrative authorities on the ground that the operation of the new program would violate title 8, California Code of Regulations, section 212.2, subdivision (a) (hereafter section 212.2(a)), which prohibits the approval of new programs that adversely affect existing programs. During writ proceedings in the superior court, the question of preemption by the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) (hereafter ERISA) of certain state laws and regulations relating to the approval process for apprenticeship programs was raised.

We granted review in this case and limited the issues to be considered in order to address the question of "the effect of [ERISA] on the power of the California Apprenticeship Council and the Chief of the Division of Apprenticeship Standards of the Department of Industrial Relations to approve or disapprove apprenticeship programs." We subsequently requested briefing on the following related issue: "Assuming that the question of whether the California Apprenticeship Council and the Chief of the Division of Apprenticeship Standards of the Department of Industrial Relations retain all or some of their powers to approve or disapprove apprenticeship programs is answered in the affirmative, is [title] 8[,] California Code of Regulations, section 212.2, subdivision (a) preempted by [ERISA]?" Thus, we must consider the relationship between ERISA preemption and the federal and state laws and regulations that govern apprenticeship training programs.

We conclude that the state's general authority to approve apprenticeship programs falls within the scope of ERISA's preemption clause, but that this authority is *saved* from preemption by virtue of the general savings clause of that statute and the fact that it is explicitly provided for in the federal laws and regulations governing apprenticeship programs. We also conclude that section 212.2(a) falls within the scope of ERISA's preemption clause. Moreover, this subdivision, to the extent that it sets forth a requirement for approval of apprenticeship programs that is completely independent of those set forth by federal laws and regulations, *does not* fall within the scope of ERISA's general savings clause and, thus, cannot be relied upon by the state to deny Fitzgerald Act (29 U.S.C. § 50) approval to the ABC-JAC program or any other apprenticeship program.

## I. BACKGROUND

### A. *The Request for Approval and the Proceedings Below*

The Southern California Chapter of the Association of Building Contractors, Inc. (hereafter ABC) is an association of nonunion contractors. The ABC decided to sponsor an apprenticeship program for the training of construction electricians. As is customary, the ABC established a joint apprenticeship training committee (hereafter JAC) to administer the program and created a trust to provide funding for the program through contributions from participating ABC employers.

In April 1988, the ABC-JAC sought state approval of its new program, which was to be operated in three counties of the state where existing, union-affiliated programs were already operating. While neither federal nor state approval is *required* for a sponsor to operate an apprenticeship program, strong financial incentives exist at both the state and federal levels for

sponsors to obtain approval. For example, only apprentices participating in an approved apprenticeship program may be paid wages lower than the applicable journeyman wage on federal and state public works projects. (29 C.F.R. § 29.2(k) (1992); Lab. Code, § 1777.5.) As the Ninth Circuit has observed: "In order for such an apprenticeship program to work, it is essential that the employer be able to pay lesser wages to the apprentices while they are in training." (*Electrical Joint Apprenticeship Com.* v. *MacDonald* (9th Cir. 1991) 949 F.2d 270, 274 [hereafter *MacDonald*], cert. denied __ U.S. __ [120 L.Ed.2d 869, 112 S.Ct. 2991].) In California, additional financial incentives exist in the form of direct financial subsidies for training provided by approved programs. (Lab. Code, §§ 3074, 3074.7; Ed. Code, § 8152.) Finally, an apprentice who completes an approved training program obtains a certificate of completion naming him or her a skilled journeyman in the chosen trade, and hence increases his or her marketability as well as the marketability of his or her employer contractor. (Cal. Code Regs., tit. 8, § 224.)

After reviewing the proposed standards[1] for the ABC-JAC program, the Chief of the Division found that the proposed program met all relevant requirements and approved the ABC-JAC program.

The existing programs objected to approval of the ABC-JAC program primarily on the grounds that there was no need for the program (Lab. Code, § 3075) and that the operation of the new program would adversely affect the existing prevailing conditions in the area in violation of section 212.2(a). As provided for under California law, the existing programs appealed the decision of the Chief of the Division to the California Apprenticeship Council (hereafter Council). (See, *post*, at p. 434.)

The Council reversed the decision on the ground that the difference in wages and fringe benefits between the ABC-JAC program and the existing programs would adversely impact the existing programs, especially with respect to their ability to compete for private projects.

In December 1988, the ABC-JAC sought a writ of mandate in the superior court to direct the Council to vacate its decision. In April 1989, the superior court granted the first petition for writ of mandate, ruling that the Council did not have before it substantial evidence of any threat to the existing programs posed by competition from the ABC-JAC program. The superior

---

[1]The standards do not directly address requirements relating to funding of the program. Nevertheless, during the approval process, the Division of Apprenticeship Standards (hereafter Division) was provided with information regarding the existence of the trust, the adequacy of the funding for the program, and the current and future sources of funding.

court also rejected the argument that sections 208, 212, and 212.2 of title 8 of the California Code of Regulations, which set forth requirements for program approval and for compensation of apprentices, were preempted under ERISA, finding that to rule otherwise would impair the enforcement of the federal apprenticeship laws and regulations.

The Council conducted further proceedings in light of the superior court's writ. In July 1989, without taking any further evidence, the Council ruled again—this time upholding the decision approving the ABC-JAC program.

The existing programs then sought a writ of mandate from the superior court, contending the Council had misinterpreted the court's instructions. In October 1989, the superior court agreed with the existing programs and remanded the matter yet again to the Council, directing it to prepare a written report stating the basis for its most recent decision in favor of the ABC-JAC program.

In January 1990, the Council issued a written decision, in which it returned to its original position and reversed the decision approving the ABC-JAC program.

In February 1990, the ABC-JAC sought a third writ of mandate from the superior court. In March 1990, the superior court granted the petition for the third writ of mandate, reversing the Council yet again.

The existing programs and the Council timely appealed. The Court of Appeal affirmed the decision of the superior court and ruled in the alternative in pertinent part that: 1) the Council's decision, reversing approval of the ABC-JAC program on the basis of section 212.2(a), was preempted by ERISA and 2) the decision was not supported by substantial evidence. In deciding the ERISA issue, the Court of Appeal wrote: "We cannot reconcile the Council's position, that it retains the power under state law to prevent employee benefit plans from providing benefits except pursuant to the Council's regulatory dictates, with decisions by the Ninth Circuit in *Hydrostorage* [v. *Northern Cal. Boilermakers* (9th Cir. 1989) 891 F.2d 719, cert. denied (1990) 498 U.S. 822 (112 L.Ed 2d 46, 111 S.Ct. 72)], the Third District in [*Operating Engineers & Participating Employees Etc. Fund* v.] *Weiss* [*Bros. Construction Co.* (1990) 221 Cal.App.3d 867 [270 Cal.Rptr. 786], cert. denied (1991) __ U.S. __ (113 L.Ed. 2d 268, 111 S.Ct. 1337)], and the Eighth Circuit in *Boise Cascade* [*Corp.* v. *Peterson* (8th Cir. 1991) 939 F.2d 632, cert. denied (1992) __ U.S. __ (120 L.Ed.2d 887, 112 S.Ct. 3014)], which squarely reject those arguments. Those decisions held that state laws on apprenticeship, and the Council's authority pursuant thereto to

prevent apprenticeship programs from varying from its directives, 'relate to' employee benefit plans and are not saved from preemption by any relevant exception."

The existing programs, the Council and the Chief of the Division petitioned this court for review of the decision of the Court of Appeal on the ERISA preemption issue claiming that the decision of the Court of Appeal conflicted with recent federal decisions, including *MacDonald, supra,* 949 F.2d 270, and *Dillingham Const. N.A., Inc.* v. *County of Sonoma* (N.D.Cal. 1991) 778 F.Supp. 1522, appeal pending Ninth Circuit (Dock. No. 92-15247),[2] and, as a result, left the Council and the Chief of the Division unable to ascertain the scope of their authority to continue to approve and disapprove apprenticeship programs. ██ We granted review limited to the issues previously specified.[3]

## B. *Apprenticeship Law*

A brief review of the federal and state statutes and regulations governing the approval process for apprenticeship programs is necessary in order to understand the present dispute regarding ERISA preemption and the procedural posture of the case.

[2]Because of the pending appeal, we do not rely upon this decision in our opinion. We observe, however, that the decision of the District Court for the Northern District of California is consistent with the holdings set forth herein.

We explicitly note that we have reviewed and considered each of the authorities cited by the parties in this case regardless of whether a particular authority is discussed herein.

[3]The ABC-JAC asserts that the petitioning parties "seek an advisory opinion by appealing only that portion of the decision of the Court of Appeal concerning ERISA's preemption of apprenticeship." We do not agree.

First, we note that "[i]t is well settled that where two independent reasons are given for a decision, neither one is to be considered mere *dictum,* since there is no more reason for calling one ground the real basis of the decision than the other. The ruling on both grounds is the judgment of the court and is of equal validity. [Citations.]" (*Bank of Italy Etc. Assn.* v. *Bentley* (1933) 217 Cal. 644, 650 [20 P.2d 940], cert. den. 290 U.S. 659 [78 L.Ed.2d 571, 54 S.Ct. 74]; cf. *Greyhound Lines, Inc.* v. *County of Santa Clara* (1986) 187 Cal.App.3d 480, 485 [231 Cal.Rptr. 702].) This rule is applicable in the present case. Both of the alternate grounds of the Court of Appeal decision are of "equal validity" and are subject to review by this court.

Second, this court limits its review to issues of statewide importance. (Cal. Rules of Court, rule 29(a).) While the ERISA preemption issues presented by this case warrant review under this standard, the substantial evidence question does not.

Third, this court is expressly authorized to specify the issues that may be argued on appeal. This court need not address all of the issues addressed by the Court of Appeal. (Cal. Rules of Court, rules 29.2(a)(b), 29.4(b).)

Finally, our decision of these ERISA issues affects the disposition of this case. We hold that the challenged portion of the regulation under which the ABC-JAC program was denied approval is preempted by ERISA; therefore, additional administrative proceedings regarding the potential adverse effects of approval of the ABC-JAC program are unnecessary.

For these reasons, consideration of the ERISA issues specified by this court is appropriate.

### 1. *Federal Law*

In 1937, Congress first enacted legislation, known formally as the National Apprenticeship Act and commonly as the Fitzgerald Act, to encourage the establishment of modern apprenticeship programs to be administered by the federal Department of Labor. (29 U.S.C. § 50 [hereafter sometimes Fitzgerald Act].) The Fitzgerald Act provides in relevant part: "The Secretary of Labor is hereby authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship . . . ."

The Fitzgerald Act is implemented through a detailed set of regulations found at title 29, Code of Federal Regulations, sections 29.1-29.13 (1992). The scheme embodied in these regulations provides for registration or approval of apprenticeship programs for various "federal purposes"[4] by the Department of Labor, Bureau of Apprenticeship Training (hereafter Bureau). (29 C.F.R. § 29.3 (1992).) The Bureau may choose to delegate its approval power to states that have enacted their own apprenticeship laws by "recognizing" a "State Apprenticeship Agency or Council" (hereafter SAC) for this purpose. (29 C.F.R. § 29.12(a) (1992).)

Through recognition, the Secretary of Labor (hereafter Secretary) "gives the SAC the authority to determine whether an apprenticeship program conforms with the Secretary's published standards and the program is, therefore, eligible for those Federal purposes which require such a determination by the Secretary." (29 C.F.R. § 29.12(a) (1992).)[5] A program is considered to be in conformity with federal standards only if it is registered with, or approved by, either a SAC or the Bureau. (29 C.F.R. § 29.3(a) (1992).)

To be approved as a SAC, a state must submit proof of acceptable apprenticeship laws and regulations (29 C.F.R. § 29.12(a)(1) (1992)); acceptable composition of the SAC (29 C.F.R. § 29.12(a)(2) (1992)); an

---

[4] "'*Federal purposes*' includes any Federal contract, grant, agreement or arrangement dealing with apprenticeship; and any Federal financial or other assistance, benefit, privilege, contribution, allowance, exemption, preference or right pertaining to apprenticeship." (29 C.F.R. § 29.2(k) (1992).)

[5] Along with the power to register apprenticeship programs, the Secretary delegates to states with recognized SAC's the power to certify eligibility of probationary apprentices (29 C.F.R. § 29.3(d) (1992)); resolve apprenticeship complaints which are not resolvable under a collective bargaining agreement (29 C.F.R. § 29.11(b)-(f) (1992)); and enforce equal opportunity plans (29 C.F.R. § 30.15 (1992)).

acceptable State Plan for Equal Employment Opportunity in Apprenticeship that conforms with 29 Code of Federal Regulations, part 30 (29 C.F.R. § 29.12(a)(3) (1992)); a description of the standards, criteria, and requirements for program registration and/or approval (29 C.F.R. § 29.12(a)(4) (1992)); and a description of the policies and operating procedures which depart from or impose requirements in addition to those in the federal regulations (29 C.F.R. § 29.12(a)(5) (1992)). If a state does not continue to meet the federal requirements, it may be "derecognized." (29 C.F.R. § 29.13 (1992).) According to the record in this case, the Secretary, at regular intervals, reviews a SAC state's statutes and regulations for conformity to the Fitzgerald Act and its implementing regulations.

California has been certified by the Bureau as a SAC state since 1978. It is undisputed that California has maintained its SAC certification at all times relevant to this case.

### 2. *California Law*

In California, apprenticeship training is governed by the Shelley-Maloney Apprenticeship Labor Standards Act of 1939 (hereafter Shelley-Maloney Act), which is codified as California Labor Code section 3070 et seq. Pursuant to the Shelley-Maloney Act, apprenticeship training is administered by the Division, which is under the auspices of the Department of Industrial Relations (hereafter Department). (Lab. Code, § 3073.)[6] The Chief of the Division, pursuant to Labor Code section 3073, administers the apprenticeship law, acts as secretary of the Council, and is empowered to investigate and either approve or disapprove written standards for apprenticeship programs. (Lab. Code, §§ 3073, 3075, 3090; Cal. Code Regs., tit. 8, §§ 212, 212.1, and 212.2.)

The Council is established within the Division pursuant to Labor Code section 3070. The Council meets at the direction of the Director of the Department (hereafter Director) and aids the Director in formulating policies for the effective administration of the apprenticeship laws. (Lab. Code, § 3071.) The Council meets at least quarterly and is empowered to issue rules and regulations which establish apprenticeship standards, equal opportunity and affirmative action requirements for apprenticeship programs, and criteria for selection procedures for apprentices. (*Ibid.*)

The approval process for apprenticeship programs begins when the program sponsor, such as the ABC-JAC, submits written program standards to

---

[6]The Bureau and the Division coordinate their California activities under a "State of California Cooperative Working Agreement."

the Chief of the Division for approval. (Cal. Code Regs., tit. 8, § 212.) A detailed list of subjects and specifications that must be met in a program's standards in order for the program to be approved is set forth at title 8, California Code of Regulations, section 212.[7] Generally, the federal requirements for an apprenticeship program set forth at 29 Code of Federal Regulations, section 29.5 are substantively similar to the requirements of California apprenticeship law.[8]

The federal laws and regulations, however, do not address whether approval can be denied to a program if it will adversely impact an existing program. Under the California regulations, the Chief of the Division must refuse to approve a program that has such an impact. (§ 212.2(a).)[9] In furtherance of this duty and as part of the administrative review of the proposed program, the Chief of the Division is required to consult with the sponsors of any existing programs that could be affected by approval of the new program. (*Ibid.*)

Decisions of the Chief of the Division can be appealed to a three-member panel of the Council. (Cal. Code Regs., tit. 8, §§ 212.2, subd. (c), 203.)[10] The decision of the appeal board is submitted to the full Council for final consideration. (Cal. Code Regs., tit. 8, § 203, subd. (a)(5).)

It is in light of this scheme of federal and state regulation of apprenticeship programs that we consider the ERISA preemption questions presented by this case.

---

[7]Because of its length, title 8, California Code of Regulations, section 212 is reproduced in full in an appendix at the end of this opinion.

[8]Because of its length, Title 29, Code of Federal Regulations, section 29.5 (1992) is reproduced in full in an appendix at the end of this opinion.

[9]Section 212.2(a) states in full:

"(a) The Chief DAS [Chief of the Division] shall consult with the sponsor, or sponsors, of the existing program or programs in the area when the apprenticeship standards submitted for approval would result in establishing a program where a similar program is already established and functioning or when it would affect an existing program or programs. Approval shall be denied when it is found that existing prevailing conditions (including the training standards) in the area and industry would in any way be lowered or adversely affected. The Chief DAS [Chief of the Division] shall timely notify the sponsor or sponsors of such existing programs of his/her decision."

[10]Because we have limited the issues to be addressed in this case, we do not address here the state law question of the authority of the Council to review the decisions of the Chief of the Division to grant or deny registration of an apprenticeship program.

## II. ANALYSIS

### A. *ERISA Preemption*

■ ERISA is a comprehensive federal statute designed to promote the interests of employees and their beneficiaries in employee pension and benefit plans. (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 90 [77 L.Ed.2d 490, 496-497, 103 S.Ct. 2890] [hereafter *Shaw*]; *Marshall* v. *Bankers Life & Casualty Co.* (1992) 2 Cal.4th 1045, 1050-1051 [10 Cal.Rptr.2d 72, 832 P.2d 573], cert. denied __ U.S. __ [121 L.Ed.2d 537, 113 S.Ct. 601] [hereafter *Marshall*].) ERISA contains safeguards to preclude abuse and frustration of the comprehensive system of federal regulation it establishes. (*Ingersoll-Rand* v. *McClendon* (1990) 498 U.S. 133, 137-138 [112 L.Ed.2d 474, 482-483, 111 S.Ct. 478] [hereafter *Ingersoll-Rand*]; accord *Marshall, supra,* 2 Cal.4th at p. 1051.) "Prominent among these safeguards is an expansive preemption provision, found at section 514 of ERISA (29 U.S.C. § 1144[(a)] [Citations].)" (*Marshall, supra,* 2 Cal.4th at p. 1051.)

ERISA's preemption clause is to be applied expansively. (*Ingersoll-Rand, supra,* 498 U.S. at p. 138 [112 L.Ed.2d at p. 483].) As we have previously recognized: "ERISA's preemption clause is conspicuous for its breadth, establishing as an area of exclusive federal concern the subject of every State law that 'relates to' an employee benefit plan governed by ERISA." (*Marshall, supra,* 2 Cal.4th at p. 1051, citing *FMC Corp.* v. *Holliday* (1990) 498 U.S. 52, 58 [112 L.Ed.2d 356, 364, 111 S.Ct. 403].)

Despite its broad scope, ERISA's preemption clause has several exceptions. The only exception arguably relevant in this case is ERISA's so-called general "savings clause." Section 514(d) of ERISA (29 U.S.C. § 1144(d)) provides that "[n]othing in this title shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law."

In light of the governing statutes, we must determine: (1) whether this case involves an employee welfare benefit plan within the scope of ERISA's preemption clause and, (2) if so, whether ERISA's savings clause saves from preemption (a) the authority of the Council and Division to approve or disapprove apprenticeship programs for registration under the Fitzgerald Act and/or (b) the state regulation, § 212.2(a), which requires disapproval of new programs that would adversely affect existing programs. (See *Hydrostorage* v. *Northern Cal. Boilermakers* (9th Cir. 1989) 891 F.2d 719, 726-727 [hereafter *Hydrostorage*], cert. denied (1990) 498 U.S. 822 [112 L.Ed.2d 46, 111 S.Ct. 72]; accord, *Operating Engineers & Participating Employees etc. Fund*

v. *Weiss Bros. Construction Co.* (1990) 221 Cal.App.3d 867, 873-879 [270 Cal.Rptr. 786] [hereafter *Operating Engineers*], cert. denied (1991) __ U.S. __ [113 L.Ed.2d 268, 111 S.Ct. 1337].)

### B. *An Employee Welfare Benefit Plan*

■ The parties dispute whether this case involves an employee welfare benefit plan governed by ERISA. All parties concede that the financial aspects of the program—in other words, the trust established to receive and manage employer contributions to fund the apprenticeship program—is an ERISA plan. The Department, the Council, the existing programs, and several amici curiae, however, contend that ERISA does not govern the written standards under which apprenticeship programs operate. We conclude that both the trust and the standards form "integral part[s] of a larger 'program' established for the purpose of providing 'apprenticeship . . . training' " and that this program is an employee welfare benefit plan under ERISA. (*Hydrostorage, supra,* 891 F.2d at p. 728.)

Our starting point in this analysis is the statutory language. An employee welfare benefit plan is defined as a *"plan, fund, or program . . .* established or maintained by an employer or by an employee organization, or by both, *. . . for the purpose of providing* for its participants . . . *apprenticeship or other training programs. . . ."* (29 U.S.C. § 1002(1), italics added.) Neither the statute, nor its implementing regulations, nor its legislative history shed light upon the meaning of the operative terms that we must define, i.e., "plan," "fund," "program," or "apprenticeship program." (*Hydrostorage, supra,* 891 F.2d at p. 727; accord, *Massachusetts* v. *Morash* (1989) 490 U.S. 107, 114 [104 L.Ed.2d 98, 108, 109 S.Ct. 1668] [hereafter *Morash*].)

Finding limited guidance in the statutory language, we turn to case law. Several courts recently have addressed the question of whether apprenticeship or other training programs constitute employee welfare benefit plans for purposes of ERISA. (*Hydrostorage, supra,* 891 F.2d at pp. 727-729; *MacDonald, supra,* 949 F.2d at p. 274; *Operating Engineers, supra,* 221 Cal.App.3d at pp. 876-877; *Boise Cascade Corp.* v. *Peterson* (8th Cir. 1991) 939 F.2d 632, 637 [hereafter *Boise Cascade*], cert. denied (1992) __ U.S. __ [120 L.Ed.2d 887, 112 S.Ct. 3014]; *National Elevator Industry, Inc.* v. *Calhoon* (10th Cir. 1992) 957 F.2d 1555, 1558 [hereafter *National Elevator*], cert. denied __ U.S. __ [121 L.Ed.2d 331, 113 S.Ct. 406.) The courts in each of these cases answered this question in the affirmative.

The seminal case in this area is the Ninth Circuit opinion in *Hydrostorage, supra,* 891 F.2d 719. Among the issues presented in that case was whether

an administrative order interpreting Labor Code section 1777.5, which requires the hiring of apprentices and the contribution of funds to approved apprenticeship programs by any employer working on a state public works project, was preempted by ERISA. After an extensive analysis, the *Hydrostorage* court held that section 1777.5 as applied was preempted. (*Hydrostorage, supra*, 891 F.2d at p. 732.)

In addressing the threshold question of whether the statute related to an employee welfare benefit plan, the *Hydrostorage* court looked to the "plain language" of the ERISA statute to determine its meaning. (*Hydrostorage, supra*, 891 F.2d at pp. 727, 728.) Based upon prior authority and a stipulation of the parties, the *Hydrostorage* court had little difficulty determining that the trust fund established to finance the apprenticeship program was an ERISA plan. (*Ibid.*; cf. *Carpenters So. Cal. Admin. Corp.* v. *El Capitan Development Co.* (1991) 53 Cal.3d 1041, 1045 [282 Cal.Rptr. 277, 811 P.2d 296] [hereafter *Carpenters*], cert. denied __ U.S. __ (116 L.Ed.2d 450, 112 S.Ct. 430)].) The *Hydrostorage* court then considered whether the apprenticeship program *standards* constituted an ERISA plan. The analysis of the *Hydrostorage* court is instructive: "A more difficult question is whether the Standards constitute an 'employee welfare benefit plan,' . . . We conclude that the Standards satisfy [the] definition [found at 29 United States Code section 1002(1)(A)]. The Standards consist of a detailed, 16-page document which specifies the duties and procedure of the Committee [established to administer the program for the trust], the minimum qualifications of apprentices, the maximum ratio of apprentices to journeymen on job locations, the terms and conditions of apprenticeships, and the hours and wages of apprentices. The Standards also provide for supplemental instruction as well as periodic examination of apprentices. The Standards clearly embody 'a method of design or action, procedure, or arrangement for accomplishment of a particular . . . object,' in this case the training of apprentices. *Black's Law Dictionary* 1036 (5th ed.1979). In addition, there is no question that the Standards were established 'for the purpose of providing for its participants . . . apprenticeship or other training programs.' 29 U.S.C. § 1002(1). The Standards's stated purpose is 'the training of Boilermakers, skilled in all phases of the erection and repair industry, who will be a credit to the industry.' Finally, the Standards were established by the Committee, an entity created by the collective bargaining agreement and composed of equal numbers of representatives of labor and management. As such, the Committee qualifies as 'an employer or employee organization, or . . . both.' *Id.*" (*Hydrostorage, supra*, 891 F.2d at p. 728.) The *Hydrostorage* court concluded: "The Standards are an integral part of a larger 'program' established for the purpose of providing 'apprenticeship . . . training.' [29 United States

Code section 1002(1).] Thus, both the Fund and the Standards fall within the definition of an 'employee welfare benefit plan' under ERISA. . . . [¶] . . . . Since the Standards and Fund constitute an ERISA plan, this case clearly falls within the coverage of ERISA." (*Ibid.*)

In this case, we are presented with an apprenticeship program similar in all relevant respects to the one analyzed in *Hydrostorage.* We find no relevant factual distinctions between these cases with respect to this issue. Although we are not bound by the Ninth Circuit's interpretation of the applicable law, we find it persuasive and, therefore, hold that the ABC-JAC apprenticeship program, including the governing standards, is an ERISA employee welfare benefit plan.

Notwithstanding the persuasive analysis in *Hydrostorage, supra,* 891 F.2d 719, the Department strenuously argues that, although the fund in this case may be an ERISA plan, the standards are not. Relying upon the Supreme Court's decision in *Morash, supra,* 490 U.S. 107, the Department argues that the literal interpretation of 29 United States Code section 1002(1) undertaken by the *Hydrostorage* court is in error.

In *Morash,* the Supreme Court held that a company's policy of paying its discharged employees for their unused vacation time did not constitute an "employee welfare benefit plan" for purposes of ERISA. (*Morash, supra,* 490 U.S. at p. 120 [104 L.Ed.2d at p. 112].) The Department contends that the high court's analysis embodies a tripartite test[11] that must be applied in order to determine whether a benefit plan is an "employee welfare benefit plan" subject to ERISA and that, when applied to the facts of this case, the *Morash* analysis compels the conclusion that apprenticeship standards are not employee welfare benefit plans. Although the suggested "test" finds some support in the language of the *Morash* decision, the court in fact did not enunciate or apply such a test. Even if the court had done so, we conclude that *Morash* is readily distinguishable from the present case and that its teachings in fact buttress our conclusion that the standards are an integral part of the apprenticeship program.

---

[11]The first factor of the three-part test proposed by the Department is whether the plan presents "risks that ERISA is intended to address." (*Id.* at p. 115 [104 L.Ed.2d at pp. 108-109].) If not, the Department urges it is unlikely that Congress intended to subject the program to ERISA regulation. The second factor derives from the following language in *Morash:* "The reference to vacation payments in § 3(1) [29 United States Code section 1002(1)] should be understood to include within the scope of ERISA those . . . benefit funds, analogous to other welfare benefits, in which either the employee's right to a benefit is contingent upon some future occurrence or the employee bears a risk different from his ordinary employment risk." (*Id.* at p. 116 [104 L.Ed.2d at pp. 109-110].) The third factor is whether application of ERISA would undermine protection for employees by displacing state regulation. (*Id.* at p. 119 [104 L.Ed.2d at pp. 111-112].)

First, we observe that the Department's entire argument is premised upon the assumption that the standards may be isolated from the trust in analyzing whether an apprenticeship program is an employee welfare benefit plan under ERISA. Such a distinction, however, receives no support from the language of the statute or any decision brought to our attention, including *Morash, supra,* 490 U.S. 107.

Critical to the *Morash* decision was the fact that the vacation benefits in question were payable from the company's general funds. No separate trust or other accumulation of funds was in any way involved. The high court specifically stated: "In reaching this conclusion, we emphasize that the case before us . . . concern[s] payments by a single employer out of its general assets. An entirely different situation would be presented if a separate fund had been created by a group of employers to guarantee the payment of vacation benefits . . . ." (*Morash, supra,* 490 U.S. at p. 120 [104 L.Ed.2d at p. 112].) In this case, however, a separate fund does exist to finance the training of the apprentices, and the parties do not dispute that the fund is governed by ERISA. Thus, contrary to the Department's argument, the plan in question in this case clearly presents "risks that ERISA . . . intended to address." (*Id.* at p. 115 [104 L.Ed. at pp. 108-109].)

Furthermore, while it is true that in *Morash* the high court did not end its analysis with a literal interpretation of 29 United States Code section 1002(1) (*Morash, supra,* 490 U.S. at pp. 114-116 [104 L.Ed.2d at pp. 108-110]), it is also true that the high court specifically contrasted the vacation benefits at issue in that case with other benefits listed in section 1002(1), including "training programs," which the high court indicated would be subject to ERISA. (*Morash, supra,* 490 U.S. at pp. 115-116 [104 L.Ed.2d at p. 108-110].) The Department attempts to limit the import of the distinction drawn by the Supreme Court by pointing to the use of the language "training programs," rather than "apprenticeship programs." We believe, however, that the better interpretation is that the court used the phrase as an inclusive shorthand reference to the longer statutory phrase "apprenticeship or other training programs."

Moreover, the language of *Morash, supra,* 490 U.S. 107, supports our conclusion. It states: "Section 3(1) [29 United States Code section 1002(1)] subjects to ERISA regulation plans to provide medical, sickness, accident, disability, and death benefits, training programs, day care centers, scholarship funds, and legal services. The distinguishing feature of most of these benefits is that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside of the control of the employee.

[Citation.] . . . The reference to vacation payments in § 3(1) should be understood to include within the scope of ERISA those vacation benefit funds analogous to other welfare benefits, in which either the employee's right to a benefit is contingent upon some future occurrence or the employee bears a risk different from his ordinary employment risk." (*Id.* at pp. 115-116 [104 L.Ed.2d at pp. 108-110].) We believe that it is obvious that an apprentice incurs a risk different from the risk of ordinary employment. The apprentice agrees to accept lower pay and to complete certain educational requirements in order to learn skills which will eventually lead to recognition as a journeyman. If the apprenticeship program goes out of business or if the apprentice is expelled from the program, his investment in the training may be for naught.

Finally, *Morash* relies upon the existence of regulations stating that the "payment of vacation benefits 'out of [an] employer's general assets' rather than from a trust fund, are not employee welfare benefit plans within the meaning of ERISA." (*Morash, supra,* 490 U.S. at pp. 117-118 [104 L.Ed.2d at pp. 110-111], fn. omitted.) In the present case, there is no similar explicit administrative interpretation upon which to rely.

For these reasons, we are not persuaded that *Morash, supra,* 490 U.S. 107, calls into question the holding of *Hydrostorage, supra,* 891 F.2d 719, that standards for apprenticeship training programs must be considered part of ERISA employee welfare benefit plans. Although the Department may wish, from a policy perspective, for only the financial aspects of an apprenticeship program to be governed by ERISA, we are not free to rewrite a federal statute in order to achieve that result.

C. *Preemption of State Laws*

Having determined that the standards are an integral part of an employee welfare benefit plan under ERISA, we now must determine whether state laws and regulations authorizing the Council and the Division to approve or disapprove registration of apprenticeship training programs, and setting standards for these programs, are preempted by ERISA. We conclude that these laws fall within the scope of ERISA's preemption clause. We note, however, that reaching this conclusion does not end our analysis. As previously explained, ERISA contains a general savings clause, codified at 29 United States Code section 1144(d), and we ultimately must determine whether the laws challenged in this case are "saved" from preemption (and are therefore enforceable by the state) under this clause. Prior to reaching the determinative issue, we set forth the reasoning supporting our conclusion that the challenged laws fall within the scope of ERISA's preemption clause.

■ The preemption clause provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan . . . ." (29 U.S.C. § 1144(a), italics added.)[12] "The key to § 514(a) is found in the words 'relate to.' " (*Ingersoll-Rand, supra,* 498 U.S. at p. 138 [112 L.Ed.2d at p. 483].) "A law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a plan." (*Shaw, supra,* 463 U.S. at pp. 96-97 [77 L.Ed.2d at pp. 500-501]; accord, *Carpenters, supra,* 53 Cal.3d at p. 1048, quoting *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 47 [95 L.Ed.2d 39, 47-48, 107 S.Ct. 1549].)[13]

■ It is clear that state laws governing approval of apprenticeship programs have a "connection with" those programs. (Cf. *Boise Cascade, supra,* 939 F.2d at p. 637; *Hydrostorage, supra,* 891 F.2d at pp. 729-730; *Operating Engineers, supra,* 221 Cal.App.3d at pp. 879-880.) The laws in question prescribe minimum terms and conditions for apprenticeship training that programs must meet in order to be eligible for approval and thus for certain financial benefits. (See *ante,* at pp. 428-429.) Moreover, the state laws in question expressly refer to apprenticeship programs, including their standards. As we have previously demonstrated, these programs are ERISA plans. (See *ante,* at pp. 436-440.) ■ The Supreme Court has recognized, a "state statute's express reference to ERISA plans suffices to bring it within the federal law's preemptive reach." (*Mackey* v. *Lanier Collections Agency & Serv.* (1988) 486 U.S. 825, 830 [100 L.Ed.2d 836, 840, 108 S.Ct. 2182]; accord *Ingersoll-Rand, supra,* 498 U.S. at pp. 139-140 [112 L.Ed.2d at pp. 484-485].) ■ Reading the statutory language in its "broad sense" as we must (*Shaw, supra,* 463 U.S. at p. 98 [77 L.Ed.2d at pp. 501-502]), we find that the state laws in question are within the scope of ERISA's preemption clause. Our finding is consistent with our previous observation that "[b]ecause of the breadth of the preemption clause and the broad remedial

[12]Section 514(a) of ERISA [29 United States Code § 1144(a)] provides in full: "Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [29 United States Code section 1003(a)] and not exempt under section 4(b) [29 United States Code section 1003(b)]. This section shall take effect on January 1, 1975."

[13]"Moreover, to underscore its intent that § 514(a) be expansively applied, Congress used equally broad language in defining the 'State law' that would be preempted." (*Ingersoll-Rand, supra,* 498 U.S. at pp. 138-139 [112 L.Ed.2d at p. 483].) The statute defines " 'State law' " as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." (29 U.S.C. § 1144(c)(1).) A " 'State' " is in turn defined as "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this title." (29 U.S.C. § 1144(c)(2).)

Unless otherwise indicated, in this opinion, we use the terms "law" or "state law" in the sense of section 1144(c).

purpose of ERISA, state laws found to be beyond the scope of [. . . ERISA] are few. [Citation.]" (*Carpenters, supra,* 53 Cal.3d at pp. 1048-1049, internal quotation marks omitted.)

Without analyzing the issue in the context of the statutory language, various parties contend through complementary arguments that ERISA's preemption clause does not apply. These arguments all fit beneath the umbrella of a general contention that Congress did not intend to preempt state regulation of the substantive aspects of apprenticeship programs.[14] In light of the ERISA's statutory language and legislative history as interpreted by the high court, we reject these arguments.

The first argument advanced by the parties opposing preemption derives from their previously discussed attempt to divorce the substantive elements from the financial elements of apprenticeship programs. These parties contend that the substantive requirements for apprenticeship programs are beyond the scope of ERISA regulation and that Congress therefore could not have intended the preemption clause to apply to state laws regulating these aspects of apprenticeship programs. This argument is flatly contradicted by opinions of the Supreme Court. As the Supreme Court has explained: "We also emphasized that to interpret the pre-emption clause to apply only to state laws dealing with the subject matters covered by ERISA, such as reporting, disclosure and fiduciary duties, would be incompatible with the provision's legislative history because the House and the Senate versions of the bill that became ERISA contained limited pre-emption clauses, applicable only to state laws relating to specific subjects covered by ERISA. These were rejected in favor of the present language in the Act, 'indicat[ing] that the section's pre-emptive scope was as broad as its language.' *Shaw* [, *supra,* 463 U.S. at p. 98 (77 L.Ed.2d at pp. 501-502)]." (*FMC Corp.* v. *Holliday, supra,* 498 U.S. at pp. 58-59 [112 L.Ed.2d at pp. 364-365, fn. omitted]. See also *Ingersoll-Rand, supra,* 498 U.S. at p. 139 [112 L.Ed.2d at p. 485]; *Carpenters, supra,* 53 Cal.3d at p. 1047.)

A persuasive example of the application of this rule is found in one of the first decisions of the Ninth Circuit to address ERISA's preemptive effect.

---

[14]In addition, amicus curiae California Apprenticeship Coordinators Association argues that the state's approval authority is shielded from preemption under section 506(a) of ERISA (29 U.S.C. § 1136(a)), which authorizes the Secretary to coordinate with other state and federal agencies to carry out "his functions under this title [subchapter I of chapter 18 of title 29—Protection of Employee Benefit Rights]." Amicus curiae argues that this section authorizes the Secretary to enter into cooperative agreements, such as the operating agreement between the Division and the Bureau. This argument is belied by the statutory language. The Bureau-Division agreement was entered into in furtherance of the Secretary's responsibilities under the Fitzgerald Act, not ERISA.

(*Standard Oil Co. of California* v. *Agsalud* (9th Cir. 1980) 633 F.2d 760, affd. mem. (1981) 454 U.S. 801 [70 L.Ed.2d 71, 102 S.Ct. 79].) In considering whether Hawaii's Comprehensive Prepaid Health Care Act was preempted by ERISA, the court wrote: "Appellants in the district court argued that since ERISA was concerned primarily with the administration of benefit plans, its provisions were not intended to prevent the operation of laws like the Hawaii Act pertaining principally to benefits rather than administration. There is, however, nothing in the statute to support such a distinction between the state laws relating to benefits as opposed to administration. As the district court pointed out, the language of the statute provides that ERISA shall supersede 'any and all State laws' and that does not mean 'some but not all State laws.' [Citation.]" (*Id.* at p. 765.) The distinction between state laws relating to "financial" as opposed to "substantive" requirements for apprenticeship programs similarly is not supported.

The parties also urge that Congress could not have intended to preempt the state laws challenged in this case, because to do so would not advance any of the goals of ERISA and would result in less protection for apprentices.[15] In the several variations of this argument presented to us, not one party addresses the applicability to this case of the policy reasons underlying Congress's decision to promulgate the expansive preemption clause contained in ERISA. The legislative history of ERISA makes it abundantly clear that this clause was intended to " 'round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation.' " (*Shaw, supra*, 463 U.S. at p. 99 [77 L.Ed.2d at p. 502], quoting Remarks of Representative Dent, 120 Cong. Rec. 29197 (1974).) Preemption of state laws relating to employee welfare benefit plans that do not fall into an explicit exception in the statute is consistent with the policy choice made by Congress to prefer national consistency of regulation over other competing considerations. Given the language of the preemption clause and its legislative history, we must conclude that Congress intended for the state laws in question here to be within the scope of ERISA's preemption clause.

The parties next contend, in an argument closely related to the argument that the standards are not an employee welfare benefit plan, that the standards under which apprentices are trained and wages and welfare of employees generally are areas of compelling state interest that have been traditionally regulated by the states. Therefore, the parties argue that a rebuttable

---

[15]In support of this proposition, certain parties cite *Fort Halifax Packing Co.* v. *Coyne* (1987) 482 U.S. 1 [96 L.Ed.2d 1, 107 S.Ct. 2211] (hereafter *Fort Halifax*). In that case, the Supreme Court held that a Maine statute requiring employers to provide a one-time payment to employees in the event of a plant closure was not preempted by ERISA. The high court based its decision on the fact that the Maine statute, while it did mandate the payment of *a benefit*, did not relate to *a benefit plan*. (*Id.* at p. 8 [96 L.Ed.2d at p. 9].) In contrast, the state laws challenged in this case do relate to an ERISA *plan*.

presumption arises that Congress did not intend to preempt state laws relating to the standards under which apprentices are trained. This facet of the argument against preemption is premised primarily upon the following language in *Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 740 [85 L.Ed.2d 728, 740-741, 105 S.Ct. 2380] (hereafter *Metropolitan Life*): "We must also presume that Congress did not intend to pre-empt areas of traditional state regulation. [Citation.]"[16]

This argument, however, also fails in light of federal Supreme Court precedent. Initially, we observe that the presumption stated by the Supreme Court in *Metropolitan Life, supra,* 471 U.S. at page 740 [85 L.Ed.2d at pages 740-741], was not sufficient standing alone to prevent the preemption of the state law under review in that case. The high court held in pertinent part in *Metropolitan Life* that, although a Massachusetts statute mandating the provision of minimum mental health care benefits under certain types of insurance policies fell within the scope of ERISA's broad preemption clause, the statute was saved from preemption as a law which " 'regulates insurance' " by the "insurance saving clause" of the statute, codified as 29 United States Code section 1144(b)(2). (*Metropolitan Life, supra,* 471 U.S. at pp. 739-740 [85 L.Ed.2d at pp. 739-741]. See also *FMC Corp.* v. *Holliday, supra,* 498 U.S. at pp. 60-65 [112 L.Ed.2d at pp. 366-369].) The presumption relied upon by the parties opposing preemption was only relevant in the context of determining an apparent inconsistency between the scope of the preemption clause and the scope of the *savings* clause potentially relevant to the state law at issue in *Metropolitan Life.*[17] The potential conflict at issue in that case is not found in the present case. As the court specifically recognized: "Unlike the exemption from ERISA coverage at issue in *Shaw* [the general savings clause codified at 29 United States Code section 1144(d)],

---

[16]Some question exists as to whether the presumption set forth in *Metropolitan Life* retains any vitality. In two very recent preemption cases decided by the Supreme Court, this presumption played no role in the majority opinions, but played a substantial role in the dissenting opinions. (*Morales* v. *Trans World Airlines, Inc.* (1992) 504 U.S. __ [119 L.Ed.2d 157, 112 S.Ct. 2031] [Airline Deregulation Act]; *Gade* v. *National Solid Waste Management Assoc.* (1992) 505 U.S. __ [120 L.Ed.2d 73, 112 S.Ct. 2374] [Occupational Safety and Health Act of 1970].)

[17]The high court explained its dilemma as follows: "The insurance saving clause preserves any state law 'which regulates insurance, banking, or securities.' [29 United States Code section 1144(b).] The two pre-emption sections [the preemption clause and the insurance savings clause], while clear enough on their faces, perhaps are not a model of legislative drafting, for while the general pre-emption clause broadly pre-empts state law, the saving clause appears broadly to preserve the States' lawmaking power over much of the same regulation. While Congress occasionally decides to return to the States what it has previously taken away, it does not normally do both at the same time." (*Metropolitan Life, supra,* 471 U.S. at pp. 739-740 [85 L.Ed.2d at pp. 739-741], fn. omitted.)

the exception in § 514(b) is phrased very broadly." (*Id.* at p. 737 [85 L.Ed.2d at pp. 738-739].)

Despite the valiant efforts of some parties to manufacture uncertainty, there is none as to whether the challenged state laws in this case fall within the scope of the ERISA preemption clause. The prerequisites for employing the presumption set forth in *Metropolitan Life, supra,* 471 U.S. 724, have not been met. (*Carpenters, supra,* 53 Cal.3d at pp. 1055-1056.)[18] Moreover, our decision is supported by federal case law specifically rejecting the contention that ERISA preemption of state laws relating to apprenticeship and other training programs is forestalled by the bare fact that wages and employee welfare is an area of traditional state regulation. (*Boise Cascade, supra,* 939 F.2d at pp. 637-638; cf. *National Elevator, supra,* 957 F.2d at p. 1561.)

Finally, the parties opposing preemption assert that to hold that the state laws in question are within the scope of the ERISA preemption clause (even if they are ultimately saved from preemption under the general savings clause) could have untoward consequences in future cases. For example, the parties argue that state laws relating to day care or prevailing wages will be the next targets of ERISA preemptions suits. We express no opinion regarding the merits of such challenges. We can only state that we recognize both the potential breadth of the ERISA preemption clause as well as the fact that the federal government has promulgated few substantive regulations governing certain employee welfare benefit plans. Nevertheless, Congress chose to enact the expansive preemption clause contained in ERISA, and the legislative history reveals that the conferees who chose this language "were aware that such broad preemption might create regulatory lacunae or lead to other, unforeseen problems." (Hutchinson & Ifshin, *Federal Preemption of State Law Under the Employee Retirement Income Security Act of 1974* (1978) 46 U.Chi.L.Rev. 23, 41.) To the extent that ERISA's broad preemption provision results in the types of regulatory vacuums envisioned by various parties, it will be "the result of congressional choice and should be addressed by

---

[18]In *Carpenters,* this court recognized that some state exercises of "traditional police powers" may "affect the plan in too tenuous, remote, or peripheral a manner to warrant a finding that the law relates to the plan." (*Id.* at p. 1056, quoting *Local Union 598 Etc.* v. *J.A. Jones Const. Co.* (9th Cir. 1988) 846 F.2d 1213, 1220-1221, affd. 488 U.S. 881 [102 L.Ed.2d 202, 109 S.Ct. 210], italics and internal quotation marks omitted.) This exception is not applicable in this case. The challenged state laws mandate that apprenticeship plans adhere to specific terms and conditions in order to receive state and federal benefits, which all parties concede are essential to the functioning of the programs. (See *Boise Cascade, supra,* 939 F.2d at pp. 637, 638 ["minimum jobsite ratio rule" preempted since it does not affect the plan in a "tenuous, remote, or peripheral" manner].)

congressional action." (*Shaw, supra*, 463 U.S. at p. 106 [77 L.Ed.2d at pp. 506-507].)[19]

### D. *The Savings Clause*

As explained previously, our analysis does not end with the conclusion that the challenged state laws fall within the scope of ERISA's preemption clause. We must also decide whether these laws are "saved" from preemption under one of the exceptions set forth in ERISA. The only exception that could apply in this case is the general "savings clause," section 514(d) of ERISA (29 U.S.C. § 1144(d)), which provides that "[n]othing in this title shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law." This clause specifies that ERISA does not implicitly preempt other *federal* laws and regulations. The savings clause is, thus, consistent with Congress's intent in enacting ERISA's preemption clause " 'to foreclose any non-Federal regulation of employee benefit plans.' " (*Shaw, supra*, 463 U.S. at 104 [77 L.Ed.2d at pp. 505-506], quoting Remarks of Representative Dent, 120 Cong. Rec. 29197 (1974).)

Although the savings clause does not specifically mention state laws and regulations, courts have recognized that state laws and regulations may be saved from preemption under the savings clause to the extent that their preemption would "impair or modify" a federal law. (See, e.g., *Shaw, supra*, 463 U.S. at pp. 102-105 [77 L.Ed.2d at pp. 504-506].) Our task, therefore, is to determine whether preemption of either (1) the state's general authority to approve or disapprove apprenticeship programs or (2) the requirement found in section 212.2(a) that a new apprenticeship program not "adversely affect" existing prevailing conditions would impair the Fitzgerald Act or the federal regulations issued under it. The state laws in question are saved from preemption *only* if we answer these questions in the affirmative.

### 1. *The Savings Clause and the State's General Authority to Approve or Disapprove Apprenticeship Programs*

The next step in our analysis, therefore, is to determine whether state laws and regulations authorizing the Council and the Chief of the Division to

---

[19]We note that, during the past term, Congress considered, but failed to enact, legislation that would exempt from preemption state laws regulating both the substantive content of apprenticeship programs and prevailing wages for public works projects. (H.R. No. 2782, 102d Cong., 1st Sess. (1991); Sen. No. 794, 102d Cong., 1st Sess. (1991).) The Senate bill also would have required the Secretary to study the effects of ERISA preemption of state laws relating to employee benefit plans, report the results of the study and make recommendations regarding the findings of the study to specified congressional committees.

approve or disapprove registration of apprenticeship programs fall within ERISA's savings clause by virtue of the Fitzgerald Act and the regulations issued thereunder. Although the case is not directly analogous to the case at hand, we begin with the seminal decision of the Supreme Court in *Shaw, supra,* 463 U.S. 85. The Supreme Court in that case considered in pertinent part whether ERISA preempted all or portions of New York's Human Rights Law or whether the law was saved from preemption under the general savings clause by virtue of its relationship to title VII of the Civil Rights Act of 1964. Very briefly stated, the pertinent dispute centered around a provision found in the state law, prior to the time that such a requirement was added to title VII, that required employers to treat pregnancy in the same way other nonoccupational injuries or illnesses were treated under their disability benefits plans.

The Supreme Court determined that New York's Human Rights Law was saved in part and preempted in part. First, the court noted that title VII specifically requires recourse to available state remedies prior to invoking federal remedies. For this reason, the court found portions of the Human Rights Law were saved from ERISA preemption. The court explained: "Given the importance of state fair employment laws to the federal enforcement scheme, pre-emption of the Human Rights Law would impair Title VII to the extent that the Human Rights Law provides a means of enforcing Title VII's commands. . . . Such a disruption of the enforcement scheme contemplated by Title VII would, in the words of § 514(d) [29 United States Code section 1144(d)], 'modify' and 'impair' federal law." (*Shaw, supra,* 463 U.S. at p. 102 [77 L.Ed.2d at p. 504], fn. omitted.)

The court found that the challenged requirement of equivalent pregnancy-related disability benefits, however, was not saved from preemption by ERISA, because title VII contained no equivalent requirement. The court explained: "Insofar as state laws prohibit employment practices that are lawful under Title VII, however, pre-emption would not impair Title VII within the meaning of § 514(d) [29 United States Code section 1144(d)]." (*Shaw, supra,* 463 U.S. at p. 103 [77 L.Ed.2d at pp. 504-505].) The court further explained: "Although Title VII does not itself prevent States from extending their nondiscrimination laws to areas not covered by Title VII, [citations], it in no way depends on such extensions for its enforcement. Title VII would prohibit precisely the same employment practices, and be enforced in precisely the same manner, even if no State made additional employment practices unlawful. . . . *We fail to see how federal law would be impaired by pre-emption of a state law prohibiting conduct that federal law permitted.*" (*Id.* at pp. 103-104, fn. omitted [77 L.Ed.2d at pp. 504-505], italics added.)

■ *Shaw*, thus, teaches that it is not sufficient for purposes of invoking the protection of the savings clause that a state law is consistent with, or supplements, a federal law. Rather, preemption of the state law must have a negative effect on the functioning of, or standards set forth in, the federal law before the general savings clause will extend its protection to the state law.

The federal courts have applied the teachings of *Shaw, supra*, 463 U.S. 85, to the relationship between ERISA's savings clause and the Fitzgerald Act. One of the first cases to address this issue was *Hydrostorage, supra*, 891 F.2d 719. As previously noted, the *Hydrostorage* court held that an administrative order interpreting Labor Code section 1777.5, which requires the hiring of apprentices and the contribution of funds to state-approved apprenticeship programs by any employer working on a state public works project, was preempted by ERISA. (See, *ante*, at pp. 436-437.) The *Hydrostorage* court rejected the argument that the order was saved from preemption under ERISA's savings clause by virtue of the fact that the section promoted and encouraged the spread of approved apprenticeship programs established under the auspices of the Fitzgerald Act and its regulations. In so doing, the *Hydrostorage* court interpreted *Shaw* and the savings clause narrowly: "The [Supreme] Court's conclusion clearly rested upon the fact that the New York law functioned as an enforcement mechanism for Title VII. That is simply not the case here. The Fitzgerald Act does not articulate a 'goal of encouraging joint state/federal enforcement.' Nor does the Fitzgerald Act contain any clause which preserves state laws. [Citation.] [¶] We reject Boilermakers' argument that the Fitzgerald Act embodies a project in 'cooperative federalism' which will be 'impaired' or 'modified' within the meaning of section 514(d) if the administrative order against Hydrostorage were preempted by ERISA." (*Hydrostorage, supra*, 891 F.2d at p. 732. Accord, *Operating Engineers, supra*, 221 Cal.App.3d at pp. 878, 880; *National Elevator, supra*, 957 F.2d at pp. 1561-1562.)

The Ninth Circuit's most recent interpretation of the relationship between the preemption clause and the Fitzgerald Act is found in *MacDonald, supra*, 949 F.2d 270. In that case, the court held that a Nevada statute, which was interpreted by the state labor commissioner to provide an exemption from the state's prevailing wage laws for apprenticeship programs approved by the state, but not for apprenticeship programs approved directly by the Bureau, was preempted under ERISA as applied. In so holding, the *MacDonald* court explained the relationship between the preemption clause and the Fitzgerald Act as follows: "There is no exemption from the broad preemption provision of section 514(a) of ERISA except for the federal

Fitzgerald Act and the regulations issued thereunder. [Citation.] Thus, *any state regulation of apprenticeship programs that is separate and apart from the authorization given by the Fitzgerald Act and its accompanying regulations is preempted by section 514(a) of ERISA.* [Citation.]" (*Id.* at p. 274, italics added.) We believe that this is an accurate summary of the complex relationship between ERISA's preemption clause, ERISA's savings clause, and the federal and state apprenticeship laws. Furthermore, we find it noteworthy that the *MacDonald* court also implicitly recognized that states may continue to exercise general approval authority under the Fitzgerald Act and its regulations: "29 C.F.R. § 29.3 provides for a dual system of approval and recognition so that either the [Bureau] or the State Apprenticeship Council can approve an apprenticeship program for federal purposes. However, either agency is constrained in its approval to apply the requirements and standards of the federal regulations." (*Id.* at p. 273, fn. omitted.)

 We are convinced that preemption of state approval functions would impair, within the meaning of the savings clause, the federal laws governing apprenticeship training. The Fitzgerald Act is "written in very broad terms. It contains a wide grant of authority to the Secretary of Labor to develop and promote standards of training for apprentices, and to give such standards the widest possible application." (*Gregory Electric Co.* v. *United States Dept. of Labor* (D.S.C. 1967) 268 F.Supp. 987, 991.) In furtherance of this mandate, the Secretary has enacted regulations, which one court has described as "a detailed regulatory scheme defining apprenticeship programs and their requirements, and establish[ing] a review, approval, and registration process for proposed apprenticeship programs administered by State Apprenticeship Councils under the aegis of the United States Department of Labor. . . ." (*Siuslaw Concrete Const.* v. *Wash., Dept. of Transp.* (9th Cir. 1986) 784 F.2d 952, 956.)

The Secretary has specifically stated in these regulations: "The purpose of this part is to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerning the registration, for certain Federal purposes, or [*sic*] acceptable apprenticeship programs with the U.S. Department of Labor. . . . These labor standards, policies and procedures cover the registration, cancellation and deregistration or [*sic*] apprenticeship programs and of apprenticeship agreements; *the recognition of a State agency as the appropriate agency for registering local apprenticeship programs for certain Federal purposes*; and matters relating thereto." (29 C.F.R. § 29.1(b), italics added.) In furtherance of these goals, the regulatory scheme specifically includes provisions for federally approved state agencies, such as California's Division and Council, to "determine whether an apprenticeship program conforms with the *Secretary's published standards* and the program is, therefore,

eligible for those Federal purposes which require such a determination by the Secretary." (29 C.F.R. § 29.12(a) (1992), italics added.)

In light of this regulatory scheme, we find that the preemption of the state's general authority *to approve or disapprove* apprenticeship programs would "impair" the purposes and functioning of the Fitzgerald Act and its implementing regulations. Therefore, we find the state laws and regulations providing for the exercise of this general authority to be saved from ERISA preemption under section 514(d) of that statute (29 U.S.C. § 1144(d)).[20]

### 2. *The Savings Clause and Section 212.2(a)*

■ Since the Chief of the Division and the Council exercise nonpreempted approval functions, we must determine whether these nonpreempted functions extend by virtue of ERISA's savings clause to denying approval to the ABC-JAC program on the ground that the program fails to comply with section 212.2(a). This regulation provides in challenged part that a program may be denied approval when existing prevailing conditions (including training standards) in the area and industry in which the new program plans to operate would be lowered or adversely affected. (§ 212.2(a).)

Neither the Fitzgerald Act nor the regulations promulgated under it contain a similar requirement. (See, *ante*, at pp. 433-434, and *post*, at pp. 456-461.) Nevertheless, the Department claims that section 212.2(a) is saved from preemption by virtue of section 29.12(a)(5) and (e)(1) of the federal regulations. (29 C.F.R. § 29.12(a)(5) & (e)(1) (1992).) Code of Federal Regulations section 29.12(a)(5) (1992) provides for recognition of a SAC upon submission and approval of, among other requirements, "[a] description of policies and operating procedures which depart from or impose requirements in addition to those described in this part." Code of Federal Regulations section 29.12(e)(1) (1992) states: "An apprenticeship program submitted for registration with a State Apprenticeship Agency recognized by the Bureau shall, for Federal purposes, be in conformity with the State

---

[20]In just one of the many contradictory positions it has taken during this litigation, the ABC-JAC argues that we must also decide whether this approval authority extends to approval for state, as well as federal, purposes. At all times during this litigation, however, the ABC-JAC has sought to obtain state approval of its program in order to receive the federal *and state* benefits that accompany approval.

The case in its present posture does not challenge the state statutes or regulations that authorize the state benefits. Therefore, we do not find this issue to be within the scope of the review granted in this case. Rather, we decide the issue that was raised and litigated below: whether the state may exercise the approval authority that is not preempted to deny approval to the ABC-JAC program on grounds that are not specifically sanctioned by the federal regulations.

apprenticeship law, regulations, and [Equal Employment Opportunity requirements]."[21]

We do not agree with the Department's argument. Neither the fact that federal law envisions additional state regulation nor the fact that the state regulation is consistent with the purpose of the federal law resolves the question of ERISA preemption. (*Shaw, supra,* 463 U.S. at pp. 103-105 [77 L.Ed.2d at pp. 504-506]; cf. *Morales* v. *Trans World Airlines, Inc., supra,* __ U.S. __ [119 L.Ed.2d at p. 169]; *Mackey* v. *Lanier Collection Agency & Serv., supra,* 486 U.S. at pp. 829-830 [100 L.Ed.2d at pp. 843-844].) Under ERISA's savings clause as interpreted by the Supreme Court, the pertinent question remains whether the preemption of the state law would *modify, impair* or *hinder* the federal law. (*Shaw, supra,* 463 U.S. at pp. 103-105 [77 L.Ed.2d at pp. 504-506].)

Preemption of this additional state requirement for approval of apprenticeship programs in California would affect neither the purpose nor operation of the Fitzgerald Act and its regulations. (Cf. *Shaw, supra,* 463 U.S. at pp. 103-104 [77 L.Ed.2d at pp. 504-506].)[22] We first observe that the Bureau recognizes a SAC for the *purpose* of vesting the SAC with the responsibility of determining "*whether an apprenticeship program conforms with the Secretary's published standards* and the program is, therefore, eligible for those Federal purposes which require such a determination by the Secretary." (29 C.F.R. § 29.12(a) (1992), italics added.) Although the Secretary does review and consider state "policies and operating procedures which depart from or impose requirements in addition to those prescribed" by the federal regulations (29 C.F.R. § 29.12(a)(5) (1992)), the federal apprenticeship scheme is

---

[21]The requirements of this section are explicitly incorporated into the operating agreement between the Division and the Bureau.

[22]Whether section 212.2(a) is preempted by ERISA presents a wholly different question than the one presented in *Matter of Dyke* (5th Cir. 1991) 943 F.2d 1435, which was cited by several parties in their arguments opposing preemption. At issue in *Matter of Dyke* was whether a Texas statute providing a bankruptcy exemption to Texas debtors for ERISA-qualified pension plans was preempted by ERISA. The court found that the Texas statute was within the scope of ERISA's preemption clause, but held that the statute was saved from preemption under section 514(d) of ERISA (29 U.S. § 1144(d)). (*Matter of Dyke, supra,* 943 F.2d at pp. 1448-1450.) The court reasoned that the Bankruptcy Code specifically " 'permits the states to set exemption levels appropriate to the locale' " (*id.* at p. 1449, quoting 11 U.S.C. § 522(b)(2)), and, therefore, the federal code would be modified or impaired, within the meaning of ERISA's general savings clause, if ERISA preemption prohibited states from setting enforceable exemption levels for retirement benefits. The state regulation challenged in this case, however, is supported by no similar federal law or regulation. Moreover, the requirement set forth in this particular state regulation (unlike numerous other state regulations governing apprenticeship programs) is not aimed at harmonizing explicitly enunciated federal requirements with local conditions. The question of whether preemption of such regulations would modify or impair the Fitzgerald Act and its implementing regulations presents a more difficult question that is not before us in this case.

not modified, impaired or hindered if state laws embodying such policies or procedures are preempted. Even if no independent state policies or procedures existed, a SAC would be able to fulfill the purpose for which it was recognized by the Secretary.

Second, we observe that the only apparent purpose of the challenged requirement in section 212.2(a) is to restrict competition among apprenticeship programs, as it was interpreted by the Council to do in this case. The legislative history of the Fitzgerald Act and the regulations promulgated thereunder, however, do not demonstrate a Congressional intent to restrict competition in this area or to prefer existing training programs over new programs.[23]

 Moreover, although one of the purposes of the Fitzgerald Act was unquestionably to provide "a cloak of protection to put around boys and girls and encourage them to go back into the skilled trades" (Comments of Representative Fitzgerald, 81 Cong. Rec. 6632 (1937)), the standards to protect the apprentices were to be *national standards* formulated by the Secretary. (See H.R. Rep. No. 945, 75th Cong., 1st Sess., p. 2 (1937); To Safeguard the Welfare of Apprentices, Hearings Before a Subcommittee of the Com. on Labor, House of Representatives on H.R. 6205, 75th Cong., 1st Sess. (Apr. 22, 23 & 26, 1937) pp. 6 (Statement of C.R. Dooley), 28 (Statement of Arthur Rosenthal).) An apprenticeship program is not compelled to comply with the national standards in order to operate. Rather, the law relies upon federal and state financial incentives to motivate the program to voluntarily seek approval and therefore adopt the standards. To the extent an independent state law or regulation frustrates the approval of an otherwise acceptable apprenticeship program, it frustrates the federal goal of

---

[23]In fact, the Bureau has expressed concern regarding the anticompetitive potential of section 212.2(a). According to the record, California's statutes and regulations were last reviewed by the Bureau in 1988. During this 1988 "Compliance Review," the Regional Director of the Bureau reported: "In my opinion Title 8, Chapter 2, Part I, Article 4, Sec. 212.2 does establish a policy and operating procedure which is in addition to those prescribed in Title 29/29. DAS [the Division's] staff has stated that they will approve all programs that meet the established criteria and where the need for an additional program can be justified. Further, the position of DAS [the Division] is that this Section of Title 8 is not in conflict with Title 29/29." (Capitalization and citation style from the original.) The Regional Director further noted: "It is my opinion Title 8, Chapter 2, Part I, Article 4, *Section 212.2 of the California Administrative Code at least has the potential for limiting access to parallel [new, nonunion] program sponsors.* This administrative code section requires the Chief [of the Division] to consult with existing program sponsors in the geographical area, when the proposed program is similar to existing programs and might somehow adversely affect those programs. [¶] However, my concerns may be without merit, as DAS [the Division] has advised me that they will be approving a proposed parallel program [the ABC-JAC program] some time this week, for the Los Angeles area." (Italics added.)

protecting the welfare of apprentices through the voluntary adoption by apprenticeship programs of the national standards formulated by the Secretary. The structure of the federal apprenticeship scheme, thus, further supports our conclusion that the federal law will not be impaired, hindered, or modified within the meaning of ERISA's savings clause by preemption of the independent state requirement found in section 212.2(a).

We conclude that the portion of section 212.2(a), which provides that an apprenticeship program may be denied approval when existing prevailing conditions would be lowered or adversely affected in the area and industry in which the program plans to operate, is not "saved" from preemption by ERISA. Therefore, the state may not demand that an apprenticeship program satisfy this state requirement in order to obtain Fitzgerald Act approval.

### E. The Doctrine of Primary Jurisdiction

■ We now address one final argument presented by the parties. Although the argument was not raised previously in this litigation, the Department and amicus curiae California Apprenticeship Coordinators Association urge us to apply the doctrine of primary jurisdiction and refrain from determining whether section 212.2(a) is preempted by ERISA. Since we determined this issue in the previous section, it is obvious that we reject this request.

The parties contend that the policies of judicial efficiency and regulatory uniformity underlying the primary jurisdiction doctrine will be furthered by recognizing the Secretary's "exclusive original jurisdiction" over questions of whether specific state statutes or regulations are preempted by ERISA. The parties further argue that the Secretary should be accorded "exclusive original jurisdiction" over such questions by virtue of the Secretary's scrutiny of state laws and regulations during the process of qualifying a state agency to be a SAC and the monitoring on a regular basis thereafter of state laws and regulations for conformity to the federal laws and regulations (29 C.R.F. §§ 29.12(a)(4) (1992), 29.12(a)(5) (1992) and 29.13 (1992)). This argument is buttressed by reminding the court of the Secretary's expertise in labor matters in general, including the enforcement of ERISA.

This court has recognized that "[n]o rigid formula exists for applying the primary jurisdiction doctrine [citation]." (*Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 391 [6 Cal.Rptr.2d 487, 826 P.2d 730] [hereafter *Farmers Ins. Exchange*].) The court uses its discretion to determine whether the policies underlying the doctrine and the interests of justice will be served by its application. (*Id.* at pp. 391-392 & fn. 9.) Exercising this discretion, we

determine, for the following reasons, that the application of the doctrine of primary jurisdiction in this case is not warranted.

We first observe that the preemption question at issue is strictly one of statutory construction. We must determine whether preemption of the state regulation will "impair" or "hinder" the Fitzgerald Act and the regulations promulgated thereunder. This case involves neither disputed facts of a technical nature nor a voluminous record of conflicting evidence. The question is essentially one of law and is of the type daily determined by the courts without resort to administrative expertise. (See *Gt. No. Ry.* v. *Merchants Elev. Co.* (1922) 259 U.S. 285, 291, 294 [66 L.Ed. 943, 946, 947-948, 42 S.Ct. 477]; cf. *Farmers Ins. Exchange, supra*, 4 Cal.4th at p. 396, citing *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 88 [276 Cal.Rptr. 130, 801 P.2d 373].)

Nevertheless, the Department argues that, as a general matter, when considering whether the preemption of a state law or regulation will impair or hinder the Fitzgerald Act and its regulations, there will be a need for specialized agency fact-finding expertise. As an example, the Department compares the state law setting 1,000 hours as the maximum probationary period for apprentices (Lab. Code, § 3078, subd. (g)) to the federal regulation, which simply specifies that there should be a "reasonable" probationary period (29 C.F.R. § 29.5(b)(8) (1992)). The Department argues that the Secretary is in a better position than a court to decide whether a specific law or regulation, such as the 1,000-hour probationary period, complies with the corresponding federal statutes and regulations.

Assuming without deciding that there is merit to the Department's argument, the present case is entirely distinguishable. In this case, we are not confronted with a factual question. The requirement set forth in the state regulation at issue has no counterpart in the federal law. The question to be answered is simply whether such a regulation can avoid preemption.

Second, we find that the policy of uniform application of regulatory laws would not be affected by our consideration of the preemption question in this case. We are concerned with the question of whether a California regulation is preempted by a federal law and thus whether the regulation may be applied at all. The decision will not affect the federal regulations, because, if preemption of the state regulation would impair or hinder the federal regulations, the state regulation must be saved from preemption. (29 U.S.C. § 1144(d).)

The Department, however, expresses concern that conflicting decisions will arise from litigation of parallel preemption issues in federal and state

courts. (Compare *Dillingham Const. N.A., Inc.* v. *County of Sonoma, supra,* 778 F.Supp. 1522, with the present case.) The solution proposed by the Department is to remove questions of conformance of state laws and regulations to the Fitzgerald Act and its regulations "to a single forum" and have them decided "under one standard, applicable to federal as well as state employment of apprentices." The potential conflict envisioned by the Department is a product of our federal system. The solution proposed by the Department is not in fact a solution. The Secretary will not have the final word on ERISA preemption questions even if the doctrine of primary jurisdiction is invoked. "[T]he doctrine of primary jurisdiction [merely] allocates power to make *initial* decisions. When an agency has primary jurisdiction, a court may still review, applying whatever scope of review is appropriate. Primary jurisdiction governs the timing of judicial action, not the existence of judicial power to review." (Davis, *Administrative Law of the Eighties* (1989 supp.) p. 412, italics added.) Although we understand the Department's concerns, we do not believe that the application of the doctrine of primary jurisdiction in this case will serve to alleviate them.

Finally, we note that the "interests of justice militate against [the] application of the doctrine in [this] particular case." (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 391, fn. 9, citing 2 Cooper, *State Administrative Law* (1965) p. 570.) Approval of the ABC-JAC program has been tied up in administrative proceedings and courts since 1988. Moreover, according to the record, the Secretary expressed preliminary concerns regarding the state regulation in question in 1988, but has apparently decided not to take any action regarding the regulation pending the outcome of this litigation. The parties are entitled to an answer to the preemption question that they have diligently litigated. We recognize that considerations regarding inadequacy or delay in the administrative process generally are not determinative of the question of whether the doctrine of primary jurisdiction should be applied. (Cf. *Nader* v. *Allegheny Airlines* (1976) 426 U.S. 290, 302 [48 L.Ed.2d 643, 653-654, 96 S.Ct. 1978] [fact that individual consumers not entitled to initiate proceeding before administrative agency not determinative].) Nevertheless, we find that, in this case, these considerations strongly support our decision to decline to invoke the doctrine of primary jurisdiction.

## III. DISPOSITION

We affirm the decision of the Court of Appeal on the issues reviewed herein.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred. Mosk, J., concurred in the judgment.

APPENDIX

I.

Title 8, California Code of Regulations, section 212 reads in full:

"Apprenticeship programs shall be established by written standards approved by the Chief DAS [Chief of the Division]. The standards shall be approved only when they cover all work performed within the apprenticeable occupation, conform to the applicable law, and contain:

(a) Evidence of:

(1) work site facilities and equipment sufficient to train the apprentice(s);

(2) skilled workers as trainers at the work site(s);

(3) adequate arrangements for related and supplemental instruction pursuant to Labor Code Section 3074;

(4) ability to offer training and supervision in all work processes of the apprenticeable occupation(s);

(5) provisions for evaluation of on-the-job training and related and supplemental instruction;

(b) A statement of the:

(1) occupation(s);

(2) party or parties to whom the standards apply and the geographic area;

(3) definition and duties of the apprentice;

(4) working conditions of the apprentice;

(5) current applicable journeyman wage or wages;

(6) ratio or number of apprentices to be employed and the method of determining such ratio;

(7) mechanism that will be used to provide apprentices with reasonably continuous employment in the event of a lay-off or the inability of an employer to provide training in all work processes as outlined in the standards;

(8) requirement for incorporating the provisions of the standards into the apprenticeship agreement.

(c) Provisions for:

(1) establishment of an apprenticeship committee if applicable;

(2) administration of the standards;

(3) establishment of rules and regulations governing the program;

(4) determining the qualifications of employers if other than single employer programs;

(5) determining the qualifications of apprentice applicants;

(6) an apprentice worksite job progress and related and supplemental instruction record system;

(7) graduated minimum wage schedules to be paid during the term of training, and applied uniformly to all employers subject to the standards, as applicable;

(A) wage progression schedule shall be in accordance with the collective bargaining agreement, if contained therein;

(B) where the program is not subject to collective bargaining, the wage progression schedule shall be determined by the program sponsor in consultation with the Division of Apprenticeship Standards and shall in no case be

less than ten percent (10%) per year, when the entry wage is based on fifty percent (50%) of the current journeyman wage.

(8) discipline of apprentices and including provisions for fair hearings;

(9) termination or recommendation of cancellation of apprentice agreements;

(10) recommending issuance of State Certificates of Completion of Apprenticeship pursuant to Section 224 of this Chapter;

(11) revision of standards;

(12) training and education of the apprentice in first aid, safe working practices and in the recognition of occupational health and safety hazards;

(13) fair and impartial treatment of applicants for apprenticeship, selected through uniform selection procedures, which shall be an addendum to the standards, pursuant to Section 215 of this Chapter;

(14) mobility between employers when essential to provide exposure and training in various work processes in the apprenticeable occupation;

(15) approval of the standards by the Chief DAS [Chief of the Division].

(d) The names and signatures of the parties."

## II.

Title 29, Code of Federal Regulations, section 29.5 (1992) provides in full:

"An apprenticeship program, to be eligible for registration/approval by a registration/approval agency, shall conform to the following standards:

(a) The program is an organized, written plan embodying the terms and conditions of employment, training, and supervision of one or more apprentices in the apprenticeable occupation, as defined in this part, and subscribed to by a sponsor who has undertaken to carry out the apprentice training program.

(b) The program standards contain the equal opportunity pledge prescribed in 29 CFR 30.3(b) and, when applicable, an affirmative action plan

in accordance with 29 CFR 30.4, a selection method authorized in 29 CFR 30.5, or similar requirements expressed in a State Plan for Equal Employment Opportunity in Apprenticeship adopted pursuant to 29 CFR Part 30 and approved by the Department, and provisions concerning the following:

(1) The employment and training of the apprentice in a skilled trade;

(2) A term of apprenticeship, not less than 2,000 hours of work experience, consistent with training requirements as established by industry practice;

(3) An outline of the work processes in which the apprentice will receive supervised work experience and training on the job, and the allocation of the approximate time to be spent in each major process;

(4) Provision for organized, related and supplemental instruction in technical subjects related to the trade. A minimum of 144 hours for each year of apprenticeship is recommended. Such instruction may be given in a classroom through trade or industrial courses, or by correspondence courses of equivalent value, or other forms of self-study approved by the registration/approval agency.

(5) A progressively increasing schedule of wages to be paid the apprentice consistent with the skill acquired. The entry wage shall be not less than the minimum wage prescribed by the Fair Labor Standards Act, where applicable, unless a higher wage is required by other applicable Federal law, State law, respective regulations, or by collective bargaining agreement;

(6) Periodic review and evaluation of the apprentice's progress in job performance and related instruction; and the maintenance of appropriate progress records;

(7) The numeric ratio of apprentices to journeymen consistent with proper supervision, training, safety, and continuity of employment, and applicable provisions in collective bargaining agreements, except where such ratios are expressly prohibited by the collective bargaining agreements. The ratio language shall be specific and clear as to application in terms of jobsite, work force, department or plant;

(8) A probationary period reasonable in relation to the full apprenticeship term, with full credit given for such period toward completion of apprenticeship;

(9) Adequate and safe equipment and facilities for training and supervision, and safety training for apprentices on the job and in related instruction;

(10) The minimum qualifications required by a sponsor for persons entering the apprenticeship program, with an eligible starting age not less than 16 years;

(11) The placement of an apprentice under a written apprenticeship agreement as required by the State apprenticeship law and regulation, or the Bureau where no such State law or regulation exists. The agreement shall directly, or by reference, incorporate the standards of the program as part of the agreement;

(12) The granting of advanced standing or credit for previously acquired experience, training, or skills for all applicants equally, with commensurate wages for any progression steps granted;

(13) Transfer of employer's training obligation when the employer is unable to fulfill his obligation under the apprenticeship agreement to another employer under the same program with consent of the apprentice and apprenticeship committee or program sponsor;

(14) Assurance of qualified training personnel and adequate supervision on the job;

(15) Recognition for successful completion of apprenticeship evidenced by an appropriate certificate;

(16) Identification of the registration agency;

(17) Provision for the registration, cancellation and deregistration of the program; and requirement for the prompt submission of any modification or amendment thereto;

(18) Provision for the registration of apprenticeship agreements, modification, and amendments; notice to the registration office of persons who have successfully completed apprenticeship programs; and notice of cancellations, suspensions, and terminations of apprenticeship agreements and causes therefor;

(19) Authority for the termination of an apprenticeship agreement during the probationary period by either party without stated cause;

(20) A statement that the program will be conducted, operated and administered in conformity with applicable provisions of 29 CFR Part 30, as amended, or a State EEO in apprenticeship plan adopted pursuant to 29 CFR Part 30 and approved by the Department;

(21) Name and address of the appropriate authority under the program to receive, process and make disposition of complaints;

(22) Recording and maintenance of all records concerning apprenticeship as may be required by the Bureau or recognized State Apprenticeship Agency and other applicable law.