Filed 12/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BBBB BONDING CORPORATION,<br><br>    Plaintiff, Cross-defendant and<br>    Appellant,<br><br>v.<br><br>KIARA CALDWELL,<br><br>    Defendant, Cross-complainant<br>    and Respondent. | A162453<br><br>(Alameda County<br>Super. Ct. No. RG19041553) |

    This appeal requires us to interpret a long-standing consumer protection statute in a novel context: whether the requirement under Civil Code section 1799.91 that notice be afforded to cosigners of consumer credit contracts about the risks of guaranteeing such an agreement applies to bail bond premium financing agreements.[1] We conclude that it does.

    In this putative class action, the trial court enjoined appellant BBBB Bonding Corporation, doing business as Bad Boys Bail Bonds (BBBB), from enforcing bail bond premium financing agreements entered into by respondent Kiara Caldwell and other similarly situated persons who had cosigned on behalf of an arrestee without having first been provided with this statutory notice. BBBB asserts that this consumer protection law has never applied to bail bond agents or to bail bond premium contracts before. BBBB

---

[1] All further undesignated statutory references are to the Civil Code.

raises many substantive and procedural challenges to the trial court's preliminary injunction, arguing primarily that because the Legislature adopted a comprehensive scheme to regulate the conduct of bail bond licensees, it intended to exclude from such transactions the consumer protections applicable to consumer credit contracts.

We hold that a bail bond premium financing agreement between a cosigner and the bail bond agent is a consumer credit contract subject to the notice provision of section 1799.91 and related statutory protections. No statute or regulatory provision supports BBBB's claim that the legal regime governing bail bond licensees was intended to operate as the exclusive source of law for the bail bond industry. Nor is BBBB able to identify any licensee provision that stands in conflict with the cosigner notice requirement. While we appreciate that this decision may upend business expectations for bail bond agents, we cannot accept BBBB's urging that the injunction should apply only on a prospective basis. To do so would deprive respondent and other cosigners who never received statutory warning of the risks of cosigning a bail bond premium financing agreement of the protections the consumer credit laws were designed to address. We reject BBBB's other challenges to the issuance of the preliminary injunction and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 21, 2018, Caldwell was contacted by BBBB and informed that her friend D.C. had been arrested and was being held in the City of San Leandro jail. To bail her friend out, Caldwell was asked to sign several documents and provide a bail bond premium. Caldwell signed an "Unpaid Premium Agreement" (Premium Agreement) in which she became legally responsible for the bail bond premium of $5,000, representing 10 percent of D.C.'s bail. Pursuant to the Premium Agreement, Caldwell

agreed to make a downpayment of $500 and pay the balance due of $4,500 in $450 monthly installments until paid in full.

Caldwell was also required to sign an "Indemnity Agreement for Surety Bail Bond" (Indemnity Agreement) with the North River Insurance Company (North River). That contract provided that the bail bond premium payment would be "fully earned" upon D.C.'s release from jail, and would be renewed annually until the surety was legally discharged from all liability on the bond posted. Finally, Caldwell signed an "Indemnitor/ Guarantor Check List," which contained a series of acknowledgements, including an acknowledgment that she was responsible for making payments on the premium. Caldwell was told that D.C. would separately sign her own copies of the same contracts. Caldwell asserts that she was not informed of the financial risks associated with cosigning for D.C.'s bail bond, and maintains that she would not have cosigned for the bail bond premium if she had been provided with the section 1799.91 notice.

Caldwell was unable to make the installment payments beyond the initial $500 deposit. BBBB attempted to collect from her, repeatedly calling her phone, her mother, and her place of employment in an effort to persuade her to resume payments. BBBB representatives reportedly threatened litigation and claimed she could lose her job if she did not make payments. Eventually, Caldwell changed her cell phone number to avoid the repeated phone calls. Other cosigners attested to similar aggressive collection efforts by BBBB, including highly embarrassing calls to employers, calls made to homes very early in the morning or late at night, and calls in which BBBB representatives stated it could have the cosigner arrested if payment was not made.

In October 2019, BBBB initiated a collection action by filing a complaint for breach of contract and common counts against Caldwell. BBBB alleged she had breached the Premium Agreement by failing to pay the $4,500 owing on the bail bond premium.

In October 2020, Caldwell filed a class action cross-complaint against BBBB alleging causes of action for violation of the unfair competition law (Bus. & Prof. Code § 17200 et seq.; UCL) and declaratory judgment. Caldwell alleged that BBBB had engaged in an unfair and unlawful business practice in violation of the UCL by failing to provide statutory notice of the risks of cosigning a consumer credit contract under section 1799.91. She sought restitution of the money she and other putative class members had paid for bail bond premiums, a declaratory judgment that the Premium Agreements are unenforceable, and an injunction prohibiting BBBB from enforcing these agreements and requiring it to provide notice to cosigners in compliance with section 1799.91. She also requested costs and attorney fees.

Caldwell then filed a motion for a preliminary injunction seeking to enjoin BBBB from enforcing or attempting to collect on Premium Agreements signed by cosigners who were not provided with the notice required by section 1799.91. In her moving papers, Caldwell alleged that BBBB commenced at least 150 lawsuits against similarly situated cosigners in the 18-month period from July 1, 2019 through December 31, 2020. Her motion was supported by declarations from several individuals who had cosigned identical or nearly identical Premium Agreements without such notice and had been subjected to BBBB's aggressive collection efforts.

On April 8, 2021, the trial court granted Caldwell's motion for a preliminary injunction. In reviewing the collections complaints filed by BBBB in the other actions, the trial court found that the premium

agreements were "typically signed by both the arrestee and the family or friend who acts as an indemnitor." The trial court determined that Caldwell had shown a substantial likelihood of success on the merits of her UCL claim under the UCL's unlawful prong. The court found that the premium financing agreements are consumer credit contracts subject to the notice requirements of section 1799.91, and it rejected BBBB's argument that compliance with bail bond licensing regulations exempted it from complying with consumer protection statutes.

The court further found that the balance of hardships tipped decidedly towards Caldwell because she had demonstrated that she and others like her had been victimized by BBBB's failure to provide section 1799.91 notice. On the other hand, the injunction would not interfere with BBBB's ability to conduct business in California, provided it complied with state consumer protection laws.

The court enjoined BBBB from filing any actions to enforce or collect on bail bond premium agreements against cosigners who were not provided with section 1799.91 notice, or from otherwise attempting to collect on such agreements. BBBB was also enjoined from prosecuting any actions already filed, or seeking to enforce, execute, or collect on any judgments against such cosigners. The court also waived any bond requirement based on undisputed evidence that the cost of posting an injunction bond would be well beyond Caldwell's reach.

The trial court's ruling was stayed for 15 days. Shortly before that stay expired, BBBB petitioned this court for a writ of supersedeas. We stayed the trial court's ruling and ordered expedited briefing.

## II.  RELEVANT STATUTORY SCHEMES

At the center of this appeal are two statutory schemes: consumer credit protections under the Civil Code (§ 1799.90 et seq.), and the Bail Bond Regulatory Act (Ins. Code, § 1800 et seq.).  Before setting forth the parties' arguments, we describe these overlapping statutes.

### A.  California Consumer Credit Protection Laws

In 1975, the Legislature enacted a series of laws commencing with section 1799.90 designed to inform unsuspecting consumers of the consequences of cosigning consumer credit contracts for friends and family members.  (See Stats. 1975, ch. 847, §§ 1, 2, pp. 1912–1914, operative April 1, 1976.)  Prior to the enactment of these statutes, there were no provisions requiring creditors to notify such cosigners that they could be held liable for the financial obligation on the contract even when they do not receive any of the goods or services that are the subject of the contract. (See Legis. Counsel's Dig., Sen. Bill No. 560 (1975–1976 Reg. Sess.) Stats. 1975, Summary Dig., p. 214.)

Under the notice provision, if a creditor obtains the signature of more than one person on a consumer credit contract, and the signatories are not married, the creditor must provide the cosigner with a specified cosigner notice.  Section 1799.91, subdivision (a) provides in relevant part:

> "Unless the persons are married to each other, each creditor who obtains the signature of more than one person on a consumer credit contract shall deliver to each person who does not in fact receive any of the money, property, or services which are the subject matter of the consumer credit contract, prior to that person's becoming obligated on the consumer credit contract, a notice in English and Spanish in at least 10-point type as follows:
>
> "NOTICE TO COSIGNER . . .

6

"You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

"You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

"The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of *your* credit record.

"This notice is not the contract that makes you liable for the debt."

If the required cosigner notice is not given, the creditor may not enforce any resulting security interest against the cosigner. (§ 1799.95 ["No action shall be brought, nor shall any security interest be enforced, by any creditor or any assignee of a creditor on any consumer credit contract which fails to comply with this title against any person, however designated, who is entitled to notice under Section 1799.91 and who does not in fact receive any of the money, property or services which are the subject matter of the consumer credit contract."].)

The cosigner provisions apply to any " 'Consumer credit contract,' " defined in the statute as an "obligation[] to pay money on a deferred payment basis, where the money, property, services or other consideration which is the subject matter of the contract is primarily for personal, family or household purposes" and the obligation falls within any of six broad categories: (1) retail installment contracts; (2) retail installment accounts; (3) conditional sales

7

contracts; (4) loans or extensions of credit secured by other than real property or unsecured; (5) loans or extensions of credit that are subject to certain Business and Professions Code provisions related to real property loans; and (6) lease contracts.  (§ 1799.90, subd. (a).)  California's cosigner notice protections apply across a wide array of consumer credit contracts and "should be liberally construed to promote that protection, if such a construction does not contradict the plain language of the statute or lead to absurd results."  (*Garver v. Brace* (1996) 47 Cal.App.4th 995, 1002; see also *Maldonado v. Fast Auto Loans, Inc.* (2021) 60 Cal.App.5th 710, 721 ["California's consumer protection laws must be liberally, not narrowly, applied."].)

## B.     Bail Bond Contracts and Statutory Scheme

"While bail bond proceedings occur in connection with criminal prosecutions, they are independent from and collateral to the prosecutions and are civil in nature.  [Citation.]  'The object of bail and its forfeiture is to insure the attendance of the accused and his [or her] obedience to the orders and judgment of the court.' "  (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 657.)

The bail bond transaction "is a function of 'two different contracts between three different parties'—namely, (1) a contract between a criminal defendant and a surety under which the surety posts a bail bond in exchange for the defendant's payment of a premium and his [or her] promise to pay the full amount of the bond in the event of his [or her] nonappearance, and (2) a contract between the surety and the People under which the surety ' " ' "act[s] as a guarantor of the defendant's appearance in court under risk of forfeiture of the bond." ' " ' "  (*People v. The North River Ins. Co.* (2020) 48 Cal.App.5th 226, 235.)  If the defendant fails to appear, the surety becomes the state's

absolute debtor for the full amount of the bond. (*People v. Financial Casualty & Surety, Inc.* (2019) 39 Cal.App.5th 1213, 1225; see also *People v. Ranger Ins. Co.* (1994) 31 Cal.App.4th 13, 22.)

This appeal raises questions about a third contract not previously addressed by the above authorities—bond premium financing agreements between an arrestee (or cosigner) and the bail bond agent to finance the payment of the premium. A bail bond is generally arranged by a bail agent who acts on behalf of the surety company. The client (the arrestee and/or a friend or family member) utilizes the services of the bail agent to secure the undertaking of bail and the arrestee's release from detention. The bail agent charges the client the bail premium, which is normally set at 10 percent of the cash bail amount. This bail premium is typically nonrefundable.[2] If the client cannot afford to pay the full bail premium amount, the bail agent may offer to arrange for installment payments to be made over time until the debt is paid off.

The bail bond industry is regulated under the Bail Bond Regulatory Act (Ins. Code, § 1800 et seq.). The law regulates the licensing and conduct of bail bond agents and surety insurers. (See *McDonough v. Goodcell* (1939) 13 Cal.2d 741, 743–744.) "Surety insurers are required by law to execute bail undertakings through licensed bail agents (bail bondsmen), and only such licensees may post bail." (*Taylor v. Financial Casualty & Surety, Inc.* (2021) 67 Cal.App.5th 966, 989–990.)

Insurance Code section 1812 authorizes the Insurance Commissioner to promulgate reasonable rules for the "administration and enforcement" of the

---

[2] Because sureties are "at risk for paying the entire posted bail if [a defendant] abscond[s] at any time, the law permit[s] [sureties] to make the premium nonrefundable." (*Indiana Lumbermens Mutual Ins. Co. v. Alexander* (2008) 167 Cal.App.4th 1544, 1547.)

statutory scheme.  The Department of Insurance (Department) issues regulations that supplement the statutory scheme.  (See Cal. Code Regs., tit. 10, § 2053 et seq.)  These regulations address bail licensing requirements (*id.*, §§ 2055–2059), the conduct of bail licensees (*id.*, §§ 2064–2092), and the filings, statements, and records that bail licensees must maintain in connection with bail transactions (*id.*, §§ 2094–2104).

## III.  DISCUSSION

### A.  Standard of Review

" 'Pursuant to long-standing Supreme Court case law, "trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction.  The first is the likelihood that the plaintiff will prevail on the merits at trial.  The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." [Citation.]  We review a trial court's application of these factors for abuse of discretion.' " (*Urgent Care Medical Services v. City of Pasadena* (2018) 21 Cal.App.5th 1086, 1092.)  The party challenging the injunction has the burden to make a clear showing of an abuse of discretion, and "[a] trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' " (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.)

"[Q]uestions underlying the preliminary injunction are reviewed under the appropriate standard of review.  Thus, for example, issues of fact are subject to review under the substantial evidence standard; issues of pure law are subject to independent review." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1136–1137 (*Gallo*).)

**B.     Likelihood of Success on the Merits**

BBBB raises numerous challenges to the trial court's determination that Caldwell was likely to succeed on the merits of her UCL claims.  Because many of these contentions turn on questions of statutory interpretation or other questions of law, we review such claims de novo.  (*Millennium Rock Mortgage, Inc. v. T.D. Service Co.* (2009) 179 Cal.App.4th 804, 808–809.)  Where other standards of review are applicable to our analysis, we discuss our review of those matters below.

### i.  *The Bail Bond Industry Is Not Categorically Exempt From Consumer Protection Statutes*

BBBB first contends that consumer protection laws, such as the cosigner notice provision, have no application to bail bond transactions because the bail bond industry is governed by its own statutory scheme—the Bail Bond Regulatory Act and its licensee regulations.  BBBB maintains that it has not violated any provision of the Insurance Code or any of the Department's administrative regulations.  It observes that these provisions do not refer to any aspect of a bail bond transaction with the terms "credit" or "loan," nor do they characterize unpaid bail bond premiums as involving "having a borrower or involving credit."  BBBB in effect argues that because the Legislature created a comprehensive scheme to regulate the conduct of bail bond licensees, it intended to exclude from such transactions the consumer protections applicable to other kinds of contracts.

BBBB fails to support this argument by reference to any statutory text, legislative history, or court precedent.  Nothing within the text of California's consumer credit laws offers any indication that the Legislature intended to exclude bail bond transactions that otherwise qualify as a " 'Consumer credit contract' " within the meaning of section 1799.90, subdivision (a).  On the contrary, we must construe consumer protection statutes liberally so as to

11

accomplish their remedial purpose. (*Pitney-Bowes, Inc. v. State of California* (1980) 108 Cal.App.3d 307, 324.) As noted above, the Legislature intended to protect cosigners from unwittingly tying themselves to onerous consumer credit agreements by requiring that notice be given of the financial obligation cosigners were about to enter. Because consumer credit contracts arise across many different industries and circumstances, the Legislature broadly defined six categories of "consumer credit contracts" that qualify for protection. (§ 1799.90, subd. (a).)

Nor does BBBB point to any provision of the Bail Bond Regulatory Act or its regulations to support its argument that this legal regime was intended to operate as the exclusive source of law for the bail bond industry. That is not surprising because California law generally does not operate this way. Commercial enterprises are aware that they will be subject to many laws and regulations touching on different aspects of legislative interest. The Insurance Code governs the licensing of persons and companies engaged in the bail bond business and the conduct of such licensees in certain areas. But BBBB cannot plausibly suggest that compliance with its licensing obligations somehow exempts it from compliance with other statutes such as the UCL (Bus. & Prof. Code § 17200 et seq.), the Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.), or other legal requirements.

Finally, BBBB has failed to identify any conflict between the notice requirement of section 1799.91 and any provision of the Insurance Code. As Caldwell correctly observes, the Insurance Code and the Civil Code are not mutually exclusive, and compliance with one statutory regime does not in any way inhibit its ability to comply with the other.

12

### ii. The Bail Premium Financing Agreement Qualifies As a Consumer Credit Contract

BBBB next asserts that the consumer credit contract laws have no application here because the Premium Agreement "is not a consumer credit transaction within any plain understanding of that term." This contention requires us to construe the meaning of these statutory provisions and whether they apply to the premium financing agreements at issue in this appeal.

"The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] . . . Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) "[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.)

Section 1799.90, subdivision (a) defines a " 'Consumer credit contract' " as an obligation "to pay money on a deferred payment basis" where the subject matter of the contract is "primarily for personal, family or household purposes" and the obligation falls within any of six general categories. (See

*ante*, at p. 7.)  We are concerned here with the fourth type of consumer credit obligation:  "Loans or extensions of credit secured by other than real property, or unsecured, for use primarily for personal, family or household purposes."  (§ 1799.90, subd. (a)(4).)

We conclude the Premium Agreement qualifies as an "extension of credit" under section 1799.90, subdivision (a)(4).  Section 1799.90, subdivision (a)(4) does not define the term "extension of credit," but its meaning can be readily discerned by a commonsense understanding of its component words.  Black's Law Dictionary defines "credit" as "[t]he time that a seller gives the buyer to make the payment that is due."  (Black's Law Dictionary (11th ed. 2019) at p. 463.)  To "extend" means "to make available." (Merriam-Webster's Collegiate Dictionary (11th ed. 2009) p. 442.)  Under a plain reading of section 1799.90, subdivision (a)(4), a bail premium financing agreement is an "extension of credit" because it is an agreement by which the bail agent makes available to the consumer the ability to satisfy his or her obligation to pay the bail bond premium amount over a series of monthly installments.

As amici curiae the Attorney General observes, "[t]his plain language interpretation is consistent with definitions in other statutes governing consumer transactions."  For example, the Credit Services Act of 1984 (§ 1789.10 et seq.) defines an extension of credit as "the right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes."  (§ 1789.12, subd. (d).) Similarly, the Truth in Lending Act (TILA; 15 U.S.C. § 1601 et seq.) was enacted by Congress to regulate credit disclosures among "various financial institutions and other firms engaged in the extension of consumer credit.' " (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 965, quoting

15 U.S.C. § 1601(a).)  TILA defines " 'credit' " as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." (15 U.S.C. § 1602(f).)[3]

Thus, Caldwell's Premium Agreement with BBBB qualifies as a consumer credit contract because Caldwell signed an agreement (1) "to pay money on a deferred payment basis"; (2) the subject matter of the contract was "primarily for personal, family or household purposes"; (3) the obligation involved an "extension[] of credit" because Caldwell was allowed to satisfy her bail premium obligation over a series of monthly payments; and (4) Caldwell's obligation was "secured by other than real property, or unsecured." (§ 1799.90, subd. (a)(4).)

BBBB does not dispute that the contracts signed by Caldwell and her declarants were primarily for personal, family, or household purposes. Rather, BBBB contends that Caldwell was not a party to a "consumer credit

---

[3] BBBB directs our attention to an Eleventh Circuit decision which held that TILA did not apply to the execution of a contingent promissory note and mortgage put up as collateral in a bail bond indemnity agreement. (*Buckman v. American Bankers Ins. Co. of Florida* (11th Cir. 1997) 115 F.3d 892.)  The court concluded that the promissory note was not an " 'extension of credit' " under the federal statute because it was a contingent obligation.  Under the promissory note, no debt was owed unless and until the bond was forfeited and thus "[t]o the extent Plaintiff became liable for a 'debt,' it was not as a result of [the surety's] extension of a line of credit to Plaintiff, but arose by court order when the bond was breached." (*Id.* at p. 894.)  *Buckman* is distinguishable in several respects.  The case does not concern a bail premium financing agreement as the plaintiff had paid the entire premium up front.  (*Id.* at p. 893.)  Caldwell's allegations here involve an agreement to pay the bail *premium* over a series of installments, and the obligation was not contingent but was fully payable and nonrefundable the moment the arrestee was released from detention.  (See *Sharp v. Memphis Bonding Co., Inc.* (W.D.Tenn. Mar. 21, 2019, No. 18-2143) 2019 WL 1301993, at p. *11 [distinguishing *Buckman* and concluding agreement to defer payment of a bail bond premium constitutes an "extension of credit" under TILA].)

15

contract" but was instead "the indemnifier of the surety issuing the bond." BBBB reasons that in bail bond transactions, "the bail agent pays no money to the court that imposed the bond on behalf of the person requesting the bond." Instead, "the agent collects a premium from the person requesting a bond, and in return secures the promise of a surety company . . . to pay the bail amount in the future" if the arrestee fails to appear and the court declares the bond to be forfeited. BBBB adds that the terms used in the section 1799.91 notice provision are "incompatible with bail-bond agreements" because the notice refers to a " 'cosigner' who is being asked to 'guarantee' a debt '[i]f the borrower doesn't pay.' " Such terms have no application here, BBB contends, because "a bail-bond agreement consists of a promise to pay by the bail agent acting as a surety. In exchange, the *arrestee* has no obligation to pay the bail or debt, but only to appear in court."

BBBB's arguments confuse the contract at issue in this appeal. While an arrestee or indemnitor may contract with the surety to guarantee the full amount of the bail if the defendant fails to appear in court as ordered (see *People v. The North River Ins. Co.*, *supra*, 48 Cal.App.5th at p. 235), the contract we are concerned with here is a different one. A bail premium financing agreement extends credit to cosigners who are unable to afford the bail bond premium by accepting an initial downpayment and allowing them to pay the balance of the premium in monthly installments. This financing agreement is ancillary to the bail bond transaction. Defendants who have financial means will have no occasion to execute such an agreement when obtaining a bail bond because they can pay the full premium outright. And, unlike the indemnity agreement between a defendant and the surety

16

company (here North River), the premium financing agreement is between the arrestee (or cosigner) and the bail bond *agent*, here BBBB.[4]

In short, the premium financing agreement does not "indemnify the surety issuing the bond," as BBBB contends. Rather, the subject Premium Agreements allowed the cosigner to satisfy his or her obligation to pay the bail bond premium over a series of monthly payments. Thus, the transaction comports with the ordinary understanding of a consumer credit contract involving an "extension[] of credit" under section 1799.90, subdivision (a)(4).

In its reply brief, BBBB argues that the Premium Agreement cannot be an "extension of credit" because "a construction of the statute that includes installment contracts within 'loans' or 'extensions of credit' would necessarily render the California Legislature's decision to specifically and separately include the term 'retail installment contracts' in [section 1799.90,] subdivision (a)(1) completely superfluous." We disagree.

BBBB fails to explain how *it* would construe the phrase "extensions of credit" under section 1799.90, subdivision (a)(4). In any event, while an extension of credit overlaps to some degree with certain retail installment contracts, the two subdivisions also address distinct consumer credit situations. For example, an extension of credit secured by real property would be excluded from section 1799.90, subdivision (a)(4), but a retail installment contract may be secured by real property. (See, e.g., § 1803.2, subd. (b)(3) [detailing requirements for "[a]ny contract for goods or services that provides for a security interest in real property"].) In addition, a financing agreement that involved four or fewer installment payments would

---

[4] The "Indemnitor/Guarantor Checklist" signed by Caldwell expressly states that the "insurance company [(North River)] is *not a party* to any premium financing. Any financial agreement is strictly between the bail agent/agency [(BBBB)] and indemnitor." (Italics added.)

17

not qualify as a retail installment contract under subdivision (a)(1) of section 1799.90 (see § 1802.6 [defining retail installment contracts]), but may qualify as an extension of credit under subdivision (a)(4).  Even if some overlap between terms is unavoidable, "the presence of some duplication in a multiprong statutory test does not automatically render it meaningless." (*People v. Davis* (1997) 15 Cal.4th 1096, 1102.)  While " '[a] construction making some words surplusage is to be avoided' " (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 921), there is no "rule of statutory construction requiring courts 'to assume that the Legislature has used the most economical means of expression in drafting a statute . . . .' " (*River Garden Retirement Home v. Franchise Tax Bd.* (2010) 186 Cal.App.4th 922, 942.)[5]

### iii.  Caldwell Is a Cosigner Entitled to Statutory Notice

Because we conclude that the bail premium financing agreement at issue here is a consumer credit contract within the meaning of section 1799.90, such contract is subject to the consumer protections provided by statute, including the notice provision to cosigners of a consumer credit contract.  Unless the signers are married to each other, "each creditor who obtains the signature of more than one person on a consumer credit contract shall deliver to each person who does not in fact receive any of the money, property, or services which are the subject matter of the consumer credit contract" the statutorily prescribed written notice.  (§1799.91, subd. (a).)  Such notice must be given to the cosigner "prior to that person's becoming obligated on the consumer credit contract."  (*Ibid.*)

---

[5] Because we conclude that the Premium Agreement qualifies as a consumer credit contract under section 1799.90, subdivision (a)(4) as an extension of credit, we need not resolve the question whether such agreement also qualifies as a retail installment contract under subdivision (a)(1).

In determining that Caldwell was likely to succeed on the merits of her claims, the trial court found that Caldwell, her declarants, and the other cosigners of the 150 enforcement actions filed by BBBB, had not received section 1799.91 notices prior to signing BBBB's Premium Agreements. Therefore, BBBB was prohibited under section 1799.95 from filing actions or attempting to collect on these contracts with the cosigners.

BBBB raises two specific challenges to the applicability of section 1799.91. First, it argues that the statute does not apply to contracts like Caldwell's that do not contain "the signature of more than one person." BBBB notes that the Premium Agreement bears only Caldwell's signature, and the record shows that BBBB did not obtain the signature of more than one person on other bail bond premium financing agreements either. As the trial court pointed out, BBBB does not "explicitly dispute that the arrestee signs similar, if not identical documents, a fact that is confirmed by the attachments of numerous actions to enforce the agreements."[6] BBBB essentially argues that because its practice is to have a cosigner and the arrestee each sign separate bail agreements that are essentially identical, section 1799.91 should not be enforced because these documents do not bear "the signature of more than one person."

---

[6] The record indeed confirms that in the collection actions filed by BBBB against other cosigners, the various bail bond agreements, including Premium Agreements, were signed by the arrestees and cosigners on separate, essentially identical contracts. BBBB's representative also filed a declaration below verifying that arrestees sign agreements and forms by which they become liable to BBBB after they are released on bail. Moreover, Caldwell stated that she was told that D.C. would separately sign her own copies of the same contracts. Thus, to the extent BBBB challenges whether Caldwell and D.C. each signed the same or similar bail bond agreements, we conclude there is substantial evidence in the record to support the trial court's finding that Caldwell was a cosignatory to the Premium Agreement.

The trial court appropriately rejected this argument, asking, "Can section 1799.91 be so easily circumvented by simply having the arrestee and co-signer sign different although identical documents?" Relying on basic contract principles, the court concluded that the arrestee and his or her signer are engaged in one overall transaction, reasoning that several writings that pertain to the same matter may be treated as a single contract. (See *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1322 ["Where, as here, the written instruments are all part of the same transaction, they may be considered together even when the counterparties to each instrument are different."].) On appeal, BBBB makes no effort to explain why the trial court's reasoning was unsound. We conclude that when an arrestee and cosigner each sign substantially similar or identical bond premium financing agreements which bear the name of the person arrested or other indicia that the writings are linked, the trial court may construe these written instruments as a single contract in order to effectuate the purpose of section 1799.91, which is to inform cosigners of the consequences of signing a consumer credit contract.

Second, BBBB asserts that section 1799.91 does not apply to non-arrestees like Caldwell who sign Premium Agreements because these individuals are not "cosigners." Instead, they have received the "services" that are the subject of the contract by deriving a "personal benefit" from getting their family member or friend out of jail. We are not persuaded.

Section 1799.91's notice provision applies to an individual who "does not in fact receive any of the money, property, or services which are the subject matter of the consumer credit contract." (§ 1799.91, subd. (a).) The statute does not contain an exception for signatories who receive a "personal" or "intangible" benefit. In the procurement of a bail bond, the "services" are

20

received by the person who is released from detention as a result of the posting of a bail bond. BBBB's argument would write the statutory notice provision out of existence because any cosigner might derive a "personal" or psychic benefit by helping to guarantee a consumer credit contract on behalf of a friend or loved one. We do not believe the Legislature intended such a strained and self-defeating reading of this provision.

BBBB suggests another unworkable construction of the statute when it argues that Caldwell was not a "cosigner" because she received "the unique service" under the Premium Agreement of "the ability to pay part of the agreed premium over time rather than upfront." But this feature is true of all consumer credit contracts, which involve "obligations to pay money on a deferred payment basis." (§ 1799.90, subd. (a).) If the ability to repay over time itself constituted a "service," no one would be entitled to cosigner notice because all signatories to credit contracts receive the benefit of making payments over time. Accordingly, we uphold the trial court's finding that Caldwell and the putative class members who signed BBBB's Premium Agreements on behalf of other arrestees are cosigners entitled to statutory notice under section 1799.91.

### iv. *BBBB's Additional Contentions*

BBBB raises several additional arguments in its briefing, some addressing the propriety of the trial court's issuance of the preliminary injunction, and other arguments challenging the scope of the relief ordered. Because we find no merit to these contentions, we group them together here and address each argument in turn.

### a. *Effect of Failed Amendment to Civil Code*

BBBB argues the trial court's interpretation of section 1799.91 was rejected by the Legislature in 2019, when it declined to adopt proposed

21

amendments that would have expanded the definition of "consumer credit contract" in section 1799.91 (and three other consumer credit protection statutes) to expressly apply to " 'bail agreements.' "  Senate Bill No. 318 (2019–2020 Reg. Sess.) (Senate Bill 318) would have clarified that consumer credit notice provisions apply to bail bonds and immigration bonds.  The bill was reportedly not intended to change existing law, but to "restate[]" that these consumer protections "apply to bail bond and immigration bonds," purportedly in response to legal arguments being advanced by immigration bond and bail bond companies.  (Sen. Com. on Judiciary, com. on Senate Bill 318, as amended Mar. 25, 2019, Executive Summary, p. 1.)

The trial court rejected BBBB's argument, reasoning that the failure to pass the amendment did not "establish a legislative intent to exclude such transactions from that section's reach."  We agree. As our Supreme Court explains:  "In most cases there are a number of possible reasons why the Legislature might have failed to enact a proposed provision.  One reason might have been, of course, that the Legislature rejected the proposal on its merits.  But the Legislature might equally well have been motivated instead by considerations unrelated to the merits, not the least of which is that it might have believed the provision unnecessary because the law already so provided . . . .  Indeed, when . . . a provision is dropped from a bill during the enactment process, the cause may not even be a *legislative* decision at all; it may simply be that its proponents decided to withdraw the provision on tactical grounds. [¶] Because these reasons apply equally to a failure to enact a new statute and to a failure to amend an existing statute, we decline to draw any such distinction: both cases are governed by our often stated rule that 'Unpassed bills, as evidences of legislative intent, have little value.' " (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 28–29.)  Under these principles, we

22

decline BBBB's invitation to draw any inference over the Legislature's failure to pass Senate Bill No. 318.

### b. *Primary Jurisdiction Doctrine*

BBBB contends the trial court's injunction runs afoul of the primary jurisdiction doctrine, arguing that the Department has primary jurisdiction over this matter because its bail bond regulations set forth extensive disclosure requirements and "there is no indication that the [Department] has ever included the section 1799.91 disclosure as an obligation in the course of [unpaid bail bond premium transactions] or any other bail transactions."

Primary jurisdiction " 'applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 (*Farmers*), italics omitted; accord, *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 931–932.) The primary jurisdiction doctrine advances two policies: "it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws." (*Farmers*, at p. 391.) "No rigid formula exists for applying the primary jurisdiction doctrine [citation]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in

23

appropriate situations, as required by the interests of justice." (*Id.* at pp. 391–392, fns. omitted.)

The trial court below properly rejected the doctrine of primary jurisdiction on the ground that "the question [at issue] is one of interpretation of applicable statutes," which is " 'an inherently judicial function.' " It is clear that "[t]his case involves neither disputed facts of a technical nature nor a voluminous record of conflicting evidence." (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 454.) The pivotal issue in this appeal involves a question of statutory interpretation, a matter with which courts have considerable experience and which does not necessitate deferral to an administrative agency. (*Ibid.*) Accordingly, the doctrine of primary jurisdiction does not apply.[7]

### c. Exclusive Concurrent Jurisdiction

BBBB next contends that the preliminary injunction violates the doctrine of exclusive concurrent jurisdiction, asserting that the trial court lacked the power to enjoin the enforcement of hundreds of other actions that BBBB claims were pending before Caldwell filed her cross-complaint. The contention lacks merit.

The doctrine of " 'exclusive concurrent jurisdiction' " provides that when two or more courts have subject matter jurisdiction over a dispute, the court that first asserts jurisdiction assumes it to the exclusion of the others. (*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising* (2000) 85 Cal.App.4th 1168, 1175; see also *Levine v. Smith* (2006) 145 Cal.App.4th 1131, 1135 ["Under the doctrine of priority of jurisdiction, the first superior court to assume and exercise jurisdiction in the case acquires exclusive

---

[7] In its amicus curiae brief, the Department agrees that "[t]here is no basis for the Court to stay this case under the primary jurisdiction doctrine."

jurisdiction until the matter is disposed of."].)  The rule is "a judicial rule of priority or preference and is not jurisdictional in the traditional sense of the word," in that it "does not divest a court, which otherwise has jurisdiction of an action, of jurisdiction."  (*People ex rel. Garamendi v. American Autoplan, Inc.* (1993) 20 Cal.App.4th 760, 764–765, 769 (*Garamendi*).)  The purpose of this rule "is to avoid unseemly conflict between courts that might arise if they were free to make contradictory decisions or awards at the same time or relating to the same controversy" and "to protect litigants from the expense and harassment of multiple litigation."  (*Scott v. Industrial Acci. Com.* (1956) 46 Cal.2d 76, 81–82.)  Because it is a policy rule, the application of the rule in a given case depends upon the balancing of countervailing policies.  (*Childs v. Eltinge* (1973) 29 Cal.App.3d 843, 854.)

Importantly, "[t]he rule of exclusive concurrent jurisdiction is not a defense to a request for a preliminary injunction.  Exclusive concurrent jurisdiction is a judicial rule of policy which mandates that the second action be stayed upon the filing of an appropriate pleading.  Prior to the filing of such an appropriate pleading, the trial court in the second action retains jurisdiction to act.  Opposition to a request for a preliminary injunction is not such an appropriate pleading.  A trial court may not stay or dismiss an action in connection with a hearing on a preliminary injunction; it is without power to grant such relief."  (*Garamendi, supra,* 20 Cal.App.4th at p. 774.)

As Caldwell points out, BBBB has never sought to obtain a stay in this matter in deference to some earlier-filed case.  Further, there are no active earlier-filed cases in which a cosigner has cross-claimed on the grounds that BBBB is legally barred from enforcing a premium financing agreement under sections 1799.91 and 1799.95, and no prior case that involves a putative class action asserting these claims.  Thus, it appears doubtful that BBBB has

25

established grounds to dismiss or stay this action under the doctrine of exclusive concurrent jurisdiction. However, even if BBBB had properly invoked this rule, the trial court was without any power to grant a stay or dismissal of the pending action in connection with a hearing on the preliminary injunction. (*Garamendi, supra,* 20 Cal.App.4th at p. 774.)

BBBB also contends that the preliminary injunction improperly "overturns" or " 'nullif[ies]' " the entry of judgement in prior collection actions, particularly in several default judgments. We disagree. The trial court enjoins BBBB, on an interim basis, from "seeking to enforce, execute, or collect on any judgments against such cosigners." In both language and effect, the order does not disturb any prior judgment or reopen any prior case. As Caldwell notes, the preliminary injunction ensures that, while this case proceeds to an adjudication of the putative class members' claims, BBBB "is prohibited from taking any new actions that would expose defaulting cosigners to particularly severe forms of irreparable harm—wage garnishments, credit injury, the imposition of judgment liens, or the seizure of securities."[8]

### d. Due Process

BBBB asserts that the superior court's " 'retroactive application' " of an "entirely new" interpretation of section 1799.91 violates its due process rights. BBBB is mistaken. "In general, judicial decisions apply retroactively. [Citations.] This rule applies to decisions interpreting statutes, for ' "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to

---

[8] BBBB also advances an overbreadth argument that is limited to a single sentence. Because BBBB does not support its claim with reasoned analysis, we deem the issue forfeited. (See *Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 521.)

26

that construction." ' " (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 878; see also *Woosley v. State of California* (1992) 3 Cal.4th 758, 794 [" 'Whenever a decision undertakes to vindicate the original meaning of an enactment . . . retroactive application is essential to accomplish that aim.' "].)

BBBB's reliance on *Moss v. Superior Court* (1998) 17 Cal.4th 396 (*Moss*) is misplaced. In *Moss*, the Supreme Court concluded that it could not retroactively apply "criminal contempt sanctions" to conduct that was authorized by settled case law in effect at the time the acts were committed. (*Id.* at p. 429.) Doing so would have posed an evident due process problem because the parties had legitimately relied on existing law. (*Ibid.*) Here, BBBB cannot claim reasonable reliance on settled law. No prior precedent authorized the conduct addressed by the preliminary injunction. Moreover, the purpose of the preliminary injunction is not to criminally sanction BBBB, but to protect the statutory rights of cosigners.

Relying on *Claxton v. Waters* (2004) 34 Cal.4th 367 and *Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, BBBB argues that "[g]iven the long-standing rules by which bail agents have conducted themselves for decades, the imposition now of a sweeping new application of section 1799.91 to their transactions should be applied, if at all, *prospectively only.*" Both cases, like *Moss,* involved settled prior legal precedent upon which the defendants had reasonably relied. (See *Claxton*, at pp. 378–379; *Williams*, at p. 1282.) Again, BBBB does not cite any precedent that would have caused it to believe it was exempt from complying with cosigner consumer notice protections.

Nor do we perceive any unfairness in enforcing the consumer protection laws at this juncture. To apply the injunction prospectively, as BBBB urges,

would exclude scores of unsuspecting cosigners who never received statutory warning of the risks of cosigning a bail bond premium agreement and became liable for the full amount of the premium and subject to enforcement actions, garnishment of wages, damage to their credit, and other serious financial and legal consequences. Caldwell and other putative class members contend they would not have agreed to cosign bail bond premium financing agreements had they be given proper warning of the consequences of their decision. As discussed above, the preliminary injunction merely ensures that no injury will befall the putative class members as the case reaches the merits of their claims. We see nothing unfair about the order, and certainly nothing violative of BBBB's due process rights.

### e. Violation of the UCL

BBBB contends that even if we conclude that the Premium Agreement is subject to section 1799.91, Caldwell is unlikely to prevail on the merits because BBBB has not violated the UCL. BBBB asserts that it did not violate the unlawful prong of the UCL because its conduct fell within the "safe harbor" provided by the Department's regulations. The trial court below disagreed, reasoning that "only the Legislature can create a 'safe harbor' " and that courts cannot "rely on insurance regulations as support for a safe harbor finding." BBBB contests this finding.[9]

---

[9] Because it found that BBBB's conduct violated the unlawful prong of the UCL, the trial court declined to address whether BBBB's conduct also violated the unfairness prong. BBBB asserts that the trial court abused its discretion by failing to reach this question. Not so. (See, e.g., *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1337–1338, fn. 23 ["Because we conclude Troyk met his burden to show Farmers committed an unlawful business practice under the UCL, we need not, and do not, address the two alternative bases for unfair competition under the UCL (i.e., whether Farmers also engaged in fraudulent or unfair business practices)."].)

The Supreme Court has explained the "safe harbor" doctrine in this way: "Although the unfair competition law's scope is sweeping, it is not unlimited. . . . Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182.) Under the safe harbor doctrine, "[t]o forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." (*Id.* at p. 183.) While an express statutory provision permitting specific conduct would be sufficient to create a safe harbor, "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." (*Id.* at p. 184.) Subsequent cases applying *Cel-Tech* have explained that to "qualify for the 'safe harbor' rule, the defendant must show that a statute 'explicitly prohibit[s] liability for the defendant's acts or omissions [citation] or 'expressly precludes an action based on the conduct.' " (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1379 (*Klein*).)

Even if the trial court were incorrect in concluding that administrative regulations cannot create a safe harbor under the UCL, an issue we need not decide, BBBB does not cite any Department regulation that "expressly" or "explicitly" bars the relief sought by Caldwell under the consumer credit protection statutes or "clearly permits" BBBB's conduct here. Instead, BBBB repeats its general point that the Department has adopted regulations governing all aspects of bail transactions, and reiterates its view that it is in compliance with its obligations under the Insurance Code.

Such showing is insufficient to support a safe harbor claim as a matter of law. If a statute does not "explicitly prohibit liability" for a defendant's specific acts or omissions, the court may not create an "implied safe harbor." (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 940 & fn. 5; see also *Klein*, *supra*, 202 Cal.App.4th at p. 1379 [declining to infer safe harbor where Legislature regulated similar conduct but did not expressly permit challenged conduct].)

## C. Balance of Hardships

As previously discussed, to demonstrate entitlement to preliminary injunctive relief, a plaintiff must show both a probability that he or she will prevail at trial, and that the " ' "interim harm that the plaintiff is likely to sustain if the injunction were denied [(favored the plaintiff)] as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued." ' " " (*Gallo*, *supra*, 14 Cal.4th at p. 1109.)

The trial court weighed the relative harms to both parties and concluded that the balance of hardships tipped decidedly towards Caldwell because she had demonstrated that she and others like her had been victimized by BBBB's failure to provide section 1799.91 notice. While BBBB asserted it might lose bail premiums worth millions of dollars if section 1799.91 were enforced against it, the court found that BBBB "ma[de] no showing it cannot provide the notice and comply with the statute" and, " '[i]n any event, the injunction does not prevent [BBBB] from conducting business in California. Rather, it merely conditions their continued activity on compliance with California's consumer protection laws.' " We conclude the trial court did not abuse its discretion in finding that the balance of hardships favors Caldwell.

On appeal, BBBB seeks to minimize Caldwell's harm by suggesting that the only wrong she suffered was the failure to receive notice "in exactly the language proscribed by section 1799.91." However, the actual harm presented stems from the fact that she and other putative class members are being held to contracts they would not otherwise have entered had they been provided with the required notice. As the trial court found, that harm is significant.

On the other side of the equation, the trial court concluded that compliance with the notice requirement is not burdensome. BBBB disagrees, asserting the court "did not come to grips with the enormous harm that would inure to BBBB from being deprived of its contractual rights." BBBB argues that it cannot go back and provide section 1799.91 notices to fully executed transactions, and protests that the injunction bars it from trying to collect on "valid" judgments already obtained. BBBB does not explain why it cannot enforce Premium Agreements against the arrestees themselves, or against persons (such as spouses) who were not entitled to cosigner notice. Further, as a matter of law, the cost of ceasing illegal conduct is not a cognizable injury. (See *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 882 ["Defendants, of course, cannot claim harm from any restrictions in the activities that constitute the public nuisance."].) We find no abuse of the trial court's discretion on this record.

BBBB finally contends that the trial court incorrectly excused Caldwell of the obligation to post an appeal bond. BBBB claims that Caldwell was required to show that each or all members of the class are unable to afford a bond to protect BBBB from the harm it will experience from having to comply with the preliminary injunction in the event it ultimately prevails on the merits. BBBB claimed below that a bond of at least $3 million was required.

31

Caldwell, citing to Code of Civil Procedure section 995.240, argued that the bond should be waived due to her limited financial resources.

In entering a preliminary injunction, the trial court ordinarily must require the posting of an appropriate bond. (Code Civ. Proc., § 529; *ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 10.) The court has the discretion, however, to waive the undertaking if the plaintiff is indigent. (Code Civ. Proc., § 995.240.) "Judicial authority to facilitate meaningful access to indigent litigants extends . . . to excusing statutorily imposed expenses that are intended to protect third parties (e.g., injunction or damage bonds) and to devising alternative procedures (e.g., additional methods of service or meaningful access) so that indigent litigants are not, as a practical matter, denied their day in court." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 605–606.)

The trial court did not abuse its discretion in excusing Caldwell from any bond requirement. The court noted that BBBB cited no authority in support of its claim that the court was required to take into account the financial resources of putative class members. On appeal, BBBB does not provide us with any such authority. We find no error.

### III. DISPOSITION

The order is affirmed.

SANCHEZ, J.


WE CONCUR:


HUMES, P. J.


BANKE, J.


A162453
*BBBB Bonding Corporation v. Caldwell*

Trial Court:        Alameda County

Trial Judge:        Hon. Brad Seligman

Counsel:

Law Offices of Jeffrey M. Cohon, APC, Jeffrey M. Cohon; Weintraub Tobin
Law Corporation, Brendan J. Begley, Charles L. Post, James Kachmar and
Audrey A. Millemann for Plaintiff, Cross-defendant and Appellant.

Keker, Van Nest & Peters LLP, Laurie Carr Mims, Jay Rapaport, Niall
Mackay Roberts, and Donna Zamora-Stevens; Lawyers' Committee for Civil
Rights of the San Francisco Bay Area, Elisa Della-Piana, Zal K. Shroff and
Rio Scharf for Defendant, Cross-complainant and Respondent.

Mitchell Silberberg & Knupp LLP, Mark C. Humphrey, Elaine K. Kim and
Alexandra Anfuso for Public Counsel, Community Legal Services in East Palo
Alto, National Consumer Law Center, The Debt Collective, The Public Law
Center, Watsonville Law Center, and East Bay Community Law Center as
Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

Rob Bonta, Attorney General, Nicklas A. Akers, Assistant Attorney General,
Michele Van Gelderen, Michael Gowe, and Alicia K. Hancock, Deputy
Attorneys General for the Attorney General of the State of California and the
California Department of Insurance as Amicus Curiae on behalf of
Defendant, Cross-complainant and Respondent.

Willkie, Farr & Gallagher LLP, Eduardo E. Santacana and Joshua D.
Anderson; Chesa Boudin, District Attorney (San Francisco) and Alex Feigen
Fasteau, Deputy District Attorney for Prosecutors Alliance of California and
District Attorney of the City and County of San Francisco as Amicus Curiae
on behalf of Defendant, Cross-complainant and Respondent.